[888 NYS2d 479]

PAULA N. FRYE, Respondent, v MONTEFIORE MEDICAL CENTER et al., Appellants, et al., Defendants.

First Department, November 5, 2009

## APPEARANCES OF COUNSEL

*Heidell, Pittoni, Murphy & Bach, LLP*, New York City (*Daniel S. Ratner* of counsel), for Montefiore Medical Center and others, appellants.

*Leahey & Johnson, PC*, New York City (*Peter James Johnson, Jr., Peter James Johnson, James P. Tenney, Joanne Filiberti* and *Rosa M. Batista* of counsel), for Norbert Berger, M.D., appellant.

*Rende, Ryan & Downes, LLP*, White Plains (*Roland T. Koke* of counsel), for Cathy Jarosz, M.D., appellant.

*Meagher & Meagher, P.C.*, White Plains (*Christopher B. Meagher* of counsel), for respondent.

## OPINION OF THE COURT

Sweeny, J.

This is a medical malpractice action where the Montefiore Medical Center defendants (WHAECOM) and Drs. Berger, Girz and Jarosz have perfected appeals from the denial of their respective motions for summary judgment dismissing the complaints against them. The facts are as follows:

On October 28, 1999, plaintiff presented at the New York Medical Group (NYMG) and was treated by defendant Dr. Franlina Umali, an internist employed by NYMG. Dr. Umali diagnosed plaintiff with diabetes and prescribed Glucophage, an oral diabetes medicine that helps control blood sugar levels.

Approximately one month later, after presenting at Bronx Lebanon Hospital for vaginal bleeding, plaintiff learned she was pregnant. She returned to NYMG on December 2, 1999 and was

seen by defendant Dr. Park, an obstetrician, who ordered a level 1 sonogram to determine whether the pregnancy was viable.[1] This sonogram was supervised and evaluated by defendant Berger, a radiologist, who reported a normal seven-week-and-five-day pregnancy.

On December 3, Dr. Park ordered plaintiff's admission to WHAECOM due to complications with her pregnancy. At his deposition, Dr. Park stated that NYMG and WHAECOM "co-manage" high-risk diabetic pregnancies such as plaintiff's, and that the purpose of plaintiff's admission to WHAECOM was to place her on insulin and have her "hooked up into the system" that NYMG has with WHAECOM's high-risk perinatologists.

Upon her admission to WHAECOM, plaintiff was examined by an obstetrics resident who reported that the admission was for evaluation of "diabetes in pregnancy." The resident recommended that plaintiff be taken off Glucophage and switched to insulin to better control her blood sugar levels. The resident's report also noted that plaintiff's blood sugar levels were elevated and that the case would be discussed with the director of WHAECOM's obstetrics and perinatology department. There is no indication in the record that this discussion ever took place.

Blood glucose testing was ordered and two units of insulin were administered to stabilize plaintiff's blood sugar levels. This was the only insulin administered during plaintiff's stay at WHAECOM. She was not seen by any of WHAECOM's perinatologists.

On December 4, plaintiff was examined by defendant Long, an attending obstetrician at WHAECOM, who did not order additional insulin, even though she noted high levels of blood sugar. At her deposition, Dr. Long stated that the result of the blood glucose test was 8.8, a reading that showed plaintiff's diabetes was not under control when she entered WHAECOM. Dr. Long did not obtain these test results until after plaintiff was discharged from WHAECOM. Dr. Long also stated that uncontrolled diabetes during pregnancy could result in the development of neural tube defects such as encephaloceles, as well as macrosomic fetus development (i.e., the fetus being large for its fetal age).

Plaintiff was discharged from WHAECOM on December 5 after being seen by defendant Jarosz, another attending obstetri-

---

1. A level 1 sonogram determines only the presence of the fetus, its age, and the amount of amniotic fluid.

cian. Dr. Jarosz did not have plaintiff's blood glucose test results prior to discharging her.

Thereafter, plaintiff's pregnancy was monitored by NYMG's doctors, who informed her that the results of WHAECOM's blood glucose test had measured 8.8, indicating that plaintiff's blood glucose levels were not under control for the three-month period prior to the test.

On March 2, 2000, Dr. Park ordered another sonogram. At his deposition, Dr. Park stated that he considered this to be a level $2^2$ sonogram. However, according to Dr. Park, someone unknown to him wrote "pregnancy dates" on the order for the sonogram. On March 16, Dr. Berger supervised a level 1 sonogram, and reported that the fetus' anatomy was "unremarkable." Dr. Berger contends that he did not get an order to perform a level 2 sonogram, and that the order requesting a sonogram for "pregnancy dates" was, by its terms, a level 1 sonogram. In any event, according to Dr. Berger and various other defendants at their respective depositions, NYMG did not have the ability to conduct level 2 sonograms in house. They testified that a patient requiring such a sonogram would have to be referred out to another facility for that purpose. Dr. Jarosz stated at her deposition that while she was employed at NYMG during the period 1999-2000, if a fetus was greater than 17 weeks and a NYMG obstetrician ordered a sonogram, it would automatically be a level 2 sonogram. She did not state, however, whether that sonogram would be conducted in house or at another facility.

On May 30, 2000, defendant Harris, an obstetrician with NYMG, diagnosed plaintiff with a diabetic condition wherein glucose is excreted through the kidneys. Dr. Harris referred plaintiff to WHAECOM's outpatient Diabetes in Pregnancy Program (DIPP), and ordered a level 2 sonogram to be performed when plaintiff entered DIPP.

On June 20, plaintiff was seen at DIPP by defendant Girz, an obstetrician/perinatologist employed by WHAECOM. Although Dr. Harris had ordered a level 2 sonogram, Dr. Girz performed a level 1 sonogram. Dr. Girz reported no fetal abnormalities and recommended an additional sonogram on June 27, which, for some reason, was never performed. During her deposition, Dr. Girz stated that a level 2 or fetal anatomy survey should be performed at approximately 20 weeks. If performed later, the

---

2. A level 2 sonogram, also referred to as a fetal anatomy survey, involves a more thorough examination of fetal anatomy than a level 1 sonogram.

ability to visualize abnormalities could be affected by the position of the fetus, as well as its weight and size. Plaintiff was approximately 37 weeks into her pregnancy on June 20.

Dr. Girz agreed that children of diabetic mothers have an increased risk of developing neural tube defects like encephaloceles. She further testified that prior to June 2000, she diagnosed approximately 10 neural tube defects, five of which were encephaloceles. With respect to those cases, Dr. Girz stated they were all diagnosed between 13 and 24 weeks and that the level of the sonogram was not an issue in those cases, since "[y]ou put the transducer on and you see it. It's not that you are particularly doing a level two or Level one ultrasound."

On June 28, with defendant Suarez the attending obstetrician on duty, plaintiff gave birth vaginally to Sherkell, who was quickly diagnosed with occipital encephalocele. This is a sac-like protrusion of the brain and the membranes that cover it through an opening in the back of the skull, and is caused by the neural tube's failure to close completely during fetal development. Dr. Harris testified at her deposition that Sherkell's encephalocele was caused by plaintiff's uncontrolled diabetes. The birth report also indicates that Sherkell had shoulder dystocia and that the encephalocele was ruptured during birth, causing a loss of spinal fluid. His birth weight was 4,734 grams.

During his deposition, Dr. Suarez stated that diabetics tend to have macrosomic babies. When presented with a macrosomic baby, a cesarean section must be considered as an option for delivery. Dr. Suarez also testified that he discussed with plaintiff that the baby was "good sized" and that if labor did not progress the way it was supposed to, a cesarean delivery would be performed. Plaintiff, at her deposition, stated a cesarean delivery was never discussed with her by anyone. Dr. Suarez estimated the baby's weight to be between 4,100 to 4,200 grams, which he did not consider excessive. However, he also stated that his estimated weight of the baby is considered macrosomic for its gestational age, and because of his concern over possible shoulder problems during delivery due to the baby's size, he arranged for a pediatrician to be present for the delivery. Dr. Suarez stated that there is no point during labor when a cesarean delivery is ruled out, as the delivering physician always has the option in an emergency.

Dr. Suarez further stated that in the case of a fetus diagnosed pre-delivery with an encephalocele, a cesarean delivery would "probably be a good precaution to prevent compression of the

mass." He indicated that the standard of care requires such delivery under those circumstances, since during a vaginal delivery, the muscles in the vagina compress the head and neck of the baby, which in turn increases the likelihood of a rupture of the encephalocele, resulting in the possible loss of spinal fluid and an open lesion. Dr. Suarez stated that he relies on the radiologist's sonogram report and does not review the films himself. The reports of both Drs. Berger and Girz did not indicate any abnormalities.

At the time of delivery, Dr. Suarez was in the physicians lounge, one floor above the delivery room. He was called when delivery commenced and went to the delivery room. When he got there, the baby had already been delivered by a resident.

Sherkell underwent surgeries to repair the ruptured encephalocele. He has been diagnosed with, inter alia, cerebral palsy, spastic quadriplegia and pervasive developmental disorder. At age four years, three months, he was on a developmental par with a 13-month-old child.

At the conclusion of discovery, each defendant timely moved for summary judgment dismissing the complaints, and all of these motions were denied.

WHAECOM and Girz argue that they played no part in plaintiff's prenatal care and diabetes management. They relied on the expert affidavit of Dr. Adiel Fleischer, an obstetrician/gynecologist/perinatologist, who opined that plaintiff's prenatal care was managed entirely by her NYMG physicians, and that the decision not to prescribe insulin was consistent with accepted standards of medical care. However, these statements are directly contradicted by Dr. Park's deposition testimony, wherein he stated that NYMG and WHAECOM comanaged plaintiff's pregnancy and that plaintiff was initially admitted to WHAECOM specifically to be placed on insulin. Dr. Fleischer stated that it was likely the encephalocele predated plaintiff's December 3, 1999 admission to WHAECOM, as the condition occurs at approximately 28 days of gestation when the neural tube fails to close properly. Dr. Fleischer opined that once the condition manifests, the baby is destined to suffer from a plethora of ailments. According to Dr. Fleischer, since plaintiff was seven weeks and five days' pregnant when admitted to WHAECOM, the encephalocele already existed and nothing could be done to alleviate its impact.

With respect to Dr. Girz's reading of the sonogram, Dr. Fleischer opined that it was proper, as the encephalocele could not be seen due to the fetus's position and size.

Dr. Girz also submitted the affirmation of Dr. Carol Benson, a board-certified radiologist and professor of medicine at Harvard Medical School, who agreed with Dr. Fleischer that the late stage of the pregnancy, as well as the size and position of the infant, particularly the low position of the infant's head within the uterine cavity, precluded Dr. Girz's ability to see the abnormality.

Dr. Jarosz argues that she saw plaintiff only once, on December 5, 1999, just prior to her discharge from WHAECOM, that other physicians decided to control plaintiff's diabetes with diet, and plaintiff's blood glucose test results were not available when she was discharged. Her expert, Dr. James Howard, board certified in obstetrics and gynecology, opined that her treatment of plaintiff and her decision to discharge plaintiff from WHAE-COM without having first obtained plaintiff's blood glucose levels was consistent with accepted standards of medical practice. He further stated that the results of the blood glucose test reflected "past diabetic control," i.e., plaintiff's blood glucose levels for the three months prior to the test, and were not a factor is determining whether to discharge plaintiff.

Dr. Berger argues that he was responsible only for supervising, reading and interpreting plaintiff's sonogram tests. Despite Dr. Park's claims to the contrary, Dr. Berger stated that Dr. Park did not order a level 2 sonogram on March 16, 2000, as the written request stated only that a sonogram was required for "pregnancy dates." His expert, Dr. Joseph Yee, a radiologist, opined that Berger's actions were within accepted medical standards and were properly supervised and interpreted, and that in reviewing the sonogram films, he saw no evidence of an encephalocele. Dr. Yee also stated that Berger could not be faulted for failing to perform a level 2 sonogram, as the attending obstetrician did not request it, and it is not within the purview of a radiologist to request such testing.

In response, plaintiff submitted a consolidated opposition, arguing that defendants deviated from accepted standards of medical care. WHAECOM's and Dr. Jarosz's claimed deviations were, inter alia, the failure to treat plaintiff's diabetes with insulin during the first trimester, which led to the development of the encephalocele. Drs. Berger's and Girz's deviations were, inter alia, the failure to detect the encephalocele during their March and June 2000 sonograms, leading to the decision to deliver Sherkell vaginally, the rupture of the encephalocele, and subsequent exacerbation of Sherkell's neurological damage.

In support of her opposition, plaintiff submitted affirmations from a series of medical experts whose names were redacted (CPLR 3101 [d] [1]). The original affirmations were examined by the IAS court in camera and accepted.

Medical expert No. 1, a physician specializing in diabetes and author of several medical texts, opined that the proximate cause of Sherkell's encephalocele was the failure of various named defendants to properly manage plaintiff's diabetes during the first trimester of her pregnancy. After citing specific deviations from accepted medical practice by Drs. Umali, Long and Park, the expert discussed WHAECOM's and Jarosz's actions. The expert stated it is widely accepted in the medical community that blood glucose levels must be aggressively controlled during the first trimester of pregnancy in order to prevent birth defects such as encephaloceles. The expert opined that WHAECOM and Dr. Jarosz committed the following deviations from accepted medical standards: (1) ordering plaintiff's diabetes to be treated with diet alone, with no aggressive follow-up plan; (2) discharging plaintiff without first examining the results of her blood glucose tests; and (3) discharging plaintiff without prescribing insulin to treat her diabetes.

This expert also commented on plaintiff's delivery. The expert noted that Dr. Suarez's admission notes indicated that shoulder precautions should be taken because of the infant's large size. However, the vaginal delivery caused the infant to suffer a "traumatic delivery," which included shoulder dystocia.

Medical expert No. 2, a physician board certified in obstetrics and gynecology, opined that the failure of WHAECOM, Jarosz, Umali, Park, Long and Harris to properly manage plaintiff's diabetes during her pregnancy was the proximate cause of the formation of Sherkell's encephalocele. With respect to WHAECOM and Jarosz, the expert opined those defendants committed the following deviations: (1) not immediately placing plaintiff on insulin, proximately causing the encephalocele to develop; and (2) failing to review the results of plaintiff's blood glucose test—which subsequently revealed a serious diabetic condition—before discharging her.

Medical expert No. 2 also opined that Dr. Berger deviated from accepted medical standards by not including the encephalocele in his differential diagnosis based upon the visibility of soft tissue density directly adjacent to the fetal skull when reading the March 16 sonogram film, and that Dr. Girz similarly deviated by failing to detect the encephalocele on June 20. This

opinion directly contradicts the opinion of Drs. Yee and Fleischer, the experts for Drs. Berger and Girz, who stated that the encephalocele was not visible on the films. Expert No. 2 also found the claimed deviations from accepted medical standards by Drs. Berger and Girz in failing to properly interpret the ultrasound films led to the vaginal delivery of Sherkell and the resulting trauma to the encephalocele and subsequent injuries.

Medical expert No. 3, board certified in roentgenology, similarly opined that Dr. Berger deviated from accepted medical standards by failing to report "a radiographic abnormality indicating an extra-cranial soft tissue density in the occipital region of the fetal head," the same soft tissue density mentioned by expert No. 2. Expert No. 3 opined that Dr. Girz's deviations consisted of failing to (1) properly conduct and interpret the June 20 ultrasound to detect the encephalocele; (2) perform the follow-up sonogram on June 27 as she herself recommended; and (3) compare her sonograms with Dr. Berger's March 2000 sonogram. This expert additionally stated that due to Dr. Harris's instruction that a level 2 sonogram be performed and the late stage of pregnancy, Dr. Girz's June 20 sonogram should have taken 15 to 30 minutes to perform properly, rather than the eight minutes she spent on the procedure. The expert also contradicted Dr. Girz's claim that a soft tissue mass was not visible in the June 20 sonogram film. The expert specifically took issue with Dr. Benson's opinion that the position of the fetal head precluded a visualization of the extracranial soft tissue that the expert found demonstrated on the film.

Medical expert No. 4, a board-certified neonatologist, took issue with Dr. Fleischer's opinion that encephaloceles develop by the 29th day of gestation. Expert No. 4 opined that this condition is not a static event, but rather develops gradually over the first 10 to 12 weeks of pregnancy, clearly within the time frame of WHAECOM's treatment of plaintiff. The expert further opined that the failure of WHAECOM and Dr. Jarosz to place plaintiff on insulin during her December 1999 admission deviated from accepted standards of medical practice and proximately caused the encephalocele to develop. This expert stated that encephaloceles are diagnosed in utero, and the standard practice is to deliver such infants by cesarean section. He did not state, however, what the standard practice would be in cases where, as here, the encephalocele is not diagnosed prior to delivery.

Medical expert No. 5, a board-certified pediatric neurologist, likewise opined that the failure to treat plaintiff with insulin

was contrary to widely accepted medical practices and proximately caused the development of the encephalocele. This expert also opined that a substantial contributing factor to Sherkell's injuries was the vaginal delivery, which placed undue pressure on the encephalocele and caused it to rupture, resulting in a loss of spinal fluid and neurological damage. This expert lay the failure to recommend a cesarean delivery at the feet of Dr. Girz, resulting from her claimed failure to detect and report the soft tissue density in the vicinity of the fetal head and her failure to perform a follow-up ultrasound.

To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury (*Elias v Bash*, 54 AD3d 354, 357 [2008], *lv denied* 11 NY3d 711 [2008]). A defendant physician moving for summary judgment must make a prima facie showing of entitlement to judgment as a matter of law by establishing the absence of a triable issue of fact as to his alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp.*, 68 NY2d 320 [1986]). To defeat such a showing, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that alleges ''[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice'' (*id.* at 325). In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude a grant of summary judgment in a defendant's favor (*Murphy v Conner*, 84 NY2d 969, 972 [1994]). Where the expert's ''ultimate assertions are speculative or unsupported by any evidentiary foundation, however, the opinion should be given no probative force and is insufficient to withstand summary judgment'' (*Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 [2002]).

■ Initially, we reject defendants' argument that all of plaintiff's experts are unqualified, that their opinions lack evidentiary support and are speculative (*see Williams v Halpern*, 25 AD3d 467 [2006]; *Farkas v Saary*, 191 AD2d 178, 180-181 [1993]). The in camera examination of the unredacted medical expert affirmations revealed that they were signed by the respective experts, who were board certified in their respective disciplines and/or had authored texts in their fields. The determination that a witness is qualified to give expert testimony

rests, in the first instance, within the sound discretion of the court, and we see no reason to disturb the IAS court's determination that plaintiff's experts were qualified to give expert opinion testimony (*Guzman v 4030 Bronx Blvd. Assoc. L.L.C.*, 54 AD3d 42, 49 [2008]).

Plaintiff and all defendants on appeal submitted conflicting expert affidavits raising disputed issues of fact as to whether defendants departed from the prevailing standards of medical care by, inter alia, not properly treating plaintiff's diabetic condition or properly ascertaining a severe fetal condition during her pregnancy, whether such deviations proximately caused the child to be born with severe disabilities and whether the fetal condition had fully manifested itself prior to defendants' administering treatment to plaintiff (*see Frobose v Weiner*, 19 AD3d 258 [2005]).

█ With respect to defendants WHAECOM and Jarosz, plaintiff provided affirmations by experts in their field who based their opinions upon evidence in the record, including medical reports, charts and records, test results, sonogram images and reports, and EBT testimony. As noted, WHAECOM's contention that it was not responsible for managing plaintiff's diabetes condition was contradicted by Dr. Park's deposition testimony, where he stated, inter alia, that the purpose of plaintiff's admission to WHAECOM was for treatment of that very condition. Plaintiff's experts Nos. 1, 2, 4 and 5 all opined that the failure of defendants, including Dr. Jarosz, to place plaintiff on insulin immediately upon determining that she was pregnant and while in WHAECOM's care proximately caused the development of the encephalocele, and that this failure was a departure from accepted medical standards. Defendants' experts submitted affirmations based upon the same medical reports, charts and records, but their opinions differed from the conclusions drawn by plaintiff's experts. Resolution of issues of credibility of expert witnesses and the accuracy of their testimony are matters within the province of the jury (*Feinberg v Feit*, 23 AD3d 517, 519 [2005]; *Halkias v Otolaryngology-Facial Plastic Surgery Assoc.*, 282 AD2d 650, 651 [2001]).

Moreover, there is a divergence of opinion among the experts concerning the length of time it takes for an encephalocele to develop, as demonstrated by the affirmations of Dr. Fleischer and plaintiff's expert No. 4. The impact of the administering of insulin on such development, the timing of such medication, and the methodology and course of treatment employed to

control plaintiff's diabetes are all issues on which the various experts disagreed. The one thing that they seemed to agree upon is that a diabetic pregnancy requires careful monitoring of blood glucose levels, and that failure to do so could result in neural tube defects, including encephaloceles.

Therefore, based upon the record before us, substantial issues of fact and credibility exist, and the IAS court properly denied summary judgment to defendants WHAECOM and Jarosz.

■ The motions by Drs. Berger and Girz present a closer question, but still compel denial. The facts in the record clearly show that neither doctor was plaintiff's treating physician for either the pregnancy or her diabetes but they were simply performing tests ordered by other physicians. Moreover, plaintiff's claim that they, on their own authority, should have performed a level 2 sonogram is not supported in the record.

It is not contested that where an encephalocele is diagnosed in utero, the preferred method of delivery is a cesarean section. There is no question that such a diagnosis did not occur here, and is one of the underlying claims plaintiff makes against defendants.

There is a clear difference of opinion among the experts as to whether Drs. Berger and Girz properly interpreted the sonogram films. Drs. Fleischer, Benson and Yee contend the films were properly interpreted according to accepted medical standards. Plaintiff's experts Nos. 2 and 3 not only take issue with these physicians as to whether there was a deviation from accepted standards, but further state that their own respective interpretations of the sonogram films reveal a soft tissue density that should have been visualized and reported. With respect to Dr. Berger, plaintiff's expert No. 4 also takes issue with Dr. Fleischer as to the time it takes for an encephalocele to develop, as well as the proper procedures to be followed to mitigate its effects on the fetus. With respect to Dr. Girz, there are conflicting opinions as to whether the information contained in the sonogram interpretations would have caused Dr. Suarez to perform a cesarean, rather than a vaginal, delivery.

Clearly, Dr. Suarez had concerns over the size of the infant and took precautions to have a pediatrician present in the event of shoulder problems, which did in fact occur during delivery. The delivery records reveal that Sherkell suffered shoulder dystocia during the vaginal delivery. Moreover, plaintiff's experts Nos. 1, 2, 4 and 5 all make reference to a "traumatic" vaginal delivery. Indeed, plaintiff's expert No. 5 opined that the failure

of Dr. Girz to recommend a cesarean delivery and the "eventual vaginal delivery with associated head trauma[ ] led to the rupture of the encephalocele and loss of cerebral spinal fluid, which significantly exacerbated Sherkell's injuries and resulting physical and cognitive deficits." This trauma caused Sherkell to be immediately transferred to the pediatric intensive care unit where he underwent surgery for repair of the ruptured encephalocele and placement of a shunt. The admissions records from the intensive care unit indicate that the encephalocele was "deflated" and "some leakage" from it was noted, supporting plaintiff's expert No. 5's conclusion of a traumatic vaginal delivery. Therefore, the question as to whether the claimed failure to visualize and report a soft tissue density mass was a contributing factor in the decision to deliver Sherkell vaginally as opposed to a cesarean section, as well as the impact of that alleged failure, cannot be resolved at this stage of the proceedings and must be decided by a jury.

Accordingly, the order of the Supreme Court, Bronx County (Yvonne Gonzalez, J.), entered August 6, 2007, which denied the motions by defendants WHAECOM, Berger, Girz and Jarosz for summary judgment, should be affirmed, without costs.

TOM, J.P., NARDELLI, McGUIRE and DeGRASSE, JJ., concur.

Order, Supreme Court, Bronx County, entered August 6, 2007, affirmed, without costs.