[951 NYS2d 4]

Paula N. Frye, Appellant, v Montefiore Medical Center et al., Respondents.

First Department, September 18, 2012

APPEARANCES OF COUNSEL

*Meagher & Meagher, P.C.*, White Plains (*Christopher B. Meagher* of counsel), for appellant.

*Heidell Pittoni Murphy & Bach LLP*, New York City (*Daniel S. Ratner* of counsel), for Montefiore Medical Center and another, respondents.

*Morris Duffy Alonso & Faley*, New York City (*Anna J. Ervolina* and *Andrea M. Alonso* of counsel), for Paige Long, M.D., respondent.

*McMahon, Martine & Gallagher, LLP*, Brooklyn (*Patrick W. Brophy* of counsel), for New York Medical Group, P.C. and another, respondents.

*Leahey & Johnson, P.C.*, New York City (*Joanne Filiberti, Peter James Johnson, Peter James Johnson, Jr.* and *James P. Tenney* of counsel), for Norbert Berger, M.D., respondent.

*Rende Ryan & Downes LLP*, White Plains (*Roland T. Koke* of counsel), for Cathy Jarosz, M.D., respondent.

*Garbarini & Scher, P.C.*, New York City (*William D. Buckley* of counsel), for Reynol Suarez, M.D., respondent.

## OPINION OF THE COURT

FREEDMAN, J.

In this obstetrical medical malpractice action, we are called upon to decide, inter alia, whether the denial of defendants' summary judgment motion(s) (70 AD3d 15 [1st Dept 2009]) prevents our considering defendants' motion in limine to preclude plaintiff's expert, Dr. Chone Ken Chen, from offering evidence specifically related to the cause of the plaintiff's infant's neurological impairments. We find that it does not because the summary judgment motion focused on different issues from those in the evidentiary motion before us now and because the posture of the case differed when each motion was presented. We further find that the motion court properly granted the motion to preclude, finding that Dr. Chen's theories were not generally accepted in either the obstetrical or neurological community (*see Frye v United States*, 293 F 1013 [DC Cir 1923]), and accordingly, properly dismissed the case as plaintiff would not be able to make out a prima facie case. We also find that defendants' motion to strike plaintiff's supplemen-

tal bill of particulars advancing a new theory of causation was properly granted, and that plaintiff's motion for leave to renew and reargue was properly denied.

Plaintiff's son, Sherkell RichardLee Frye-Samuels, now 12 years old, was born with a 2.5-centimeter occipital encephalocele, which is a skin-covered, sac-like protrusion of brain tissue and related membranes through an opening in the back of the skull. An encephalocele originates from the failure of a neural tube to close, as it should, during the early days of fetal development.

Plaintiff claims that the moving defendants, who provided her obstetrical care, deviated from good and accepted medical practice by failing to properly treat her diabetes with insulin following her discharge from their facility in December 1999, by failing to diagnose the encephalocele during her pregnancy, and by not performing a cesarean section, and that all those departures contributed to the infant's neurological damage.

By their motion in limine, defendants now seek to preclude testimony by plaintiff's expert, Dr. Chen, that a neural tube defect develops gradually over the first 10 to 12 weeks of gestation (by which time plaintiff was under defendants' care), that the encephalocele rather than or in addition to the neural tube defect is a cause of the infant's neurological damage, and that trauma to or rupture of an encephalocele during a vaginal delivery can or did cause additional neurological damage.

Defendants argue that the neural tube failure was the sole cause of the infant's impairment and that the failure occurred before plaintiff came under their care. Accordingly, defendants contend, the alleged departures could not have been a proximate cause of the infant's injuries.

Although the motion court offered both parties an opportunity to present witnesses in a *Frye* evidentiary hearing, defendants opted to rely on their papers, and plaintiff rejected the opportunity either for a hearing or to submit further papers on the ground that there was no basis to consider the reliability of her expert before trial. However, plaintiff did submit unredacted versions of previously submitted opposition affidavits and further responsive papers but waived her right to submit further papers or to a hearing (*see Matter of York v Zullich*, 89 AD3d 1447 [4th Dept 2011]).

Although we previously affirmed the denial of defendants' summary judgment motions (70 AD3d 15 [2009]), at which time some of the same issues were raised, defendants now seek a

specifically focused evidentiary ruling and furnish evidence that challenges the entire basis of Dr. Chen's causation theories. The very experts whose work Dr. Chen cited in support of his causation theories have submitted affidavits that directly controvert those theories and explain how Dr. Chen has misinterpreted their works. While the summary judgment motions concerned both liability and damages, further examination of the underlying basis of plaintiff's expert's theories as to the cause of the infant's impairments demonstrates that they are neither reliable nor generally accepted in the medical community (*see Frye v United States*, 293 F 1013 [1923]; *People v Wesley*, 83 NY2d 417 [1994]). Moreover, to the extent that some aspects of plaintiff's theories may be generally accepted in other contexts, they do not apply to the facts of this case (*see Parker v Mobil Oil Corp.*, 7 NY3d 434 [2006]).

We set forth the history of plaintiff's treatment in detail in our prior decision affirming the denial of the summary judgment motions (70 AD3d at 16-20). To briefly recapitulate, plaintiff originally sued the New York Medical Group (NYMG), Montefiore Medical Center/Weiler Hospital of Albert Einstein College of Medicine (WHAECOM), and various physicians associated with her medical and obstetrical care at NYMG and WHAECOM from December 4, 1999 until Sherkell's birth on June 28, 2000. In late October 1999, before plaintiff knew she was pregnant, NYMG internist Franlina Umali, M.D., diagnosed her with diabetes. Dr. Umali prescribed Glucophage, an oral medication designed to lower blood sugar. On December 3, 1999, plaintiff went to Bronx Lebanon Hospital, where she was found to be about seven weeks, five days pregnant. Plaintiff came under the care of NYMG obstetrician Dr. Jung Ki Park who ordered her admission to WHAECOM. Plaintiff was taken off Glucophage and two units of insulin were administered. Dr. Paige Long, the attending obstetrician at WHAECOM who examined plaintiff, and Dr. Cathy Jaroz, the WHAECOM obstetrician who discharged her before glucose test results showing elevated blood sugar levels were available, did not prescribe additional insulin.

On March 2, 2000, Dr. Park, who continued caring for plaintiff at NYMG, ordered a sonogram which he claims should have been a level 2 sonogram. Dr. Norbert Berger, a NYMG radiologist, performed a level 1 sonogram on March 16, 2000 and reported his findings as "unremarkable." Dr. Leslie Harris, a NYMG obstetrician who later monitored plaintiff's diabetes and

referred her to WHAECOM's program for pregnant diabetics, ordered another sonogram, which NYMG perinatologist Barbara Girz, D.O., performed on June 20. Although Dr. Harris ordered a level 2 sonogram, Dr. Girz also performed a level 1 sonogram and reported no fetal abnormalities, but recommended another sonogram on June 27th. Dr. Girz testified that a level 2 sonogram would more likely show fetal abnormalities at 20 weeks, but if performed later, the fetus' weight and size could impair the ability to detect abnormalities.

At approximately 37 weeks, on June 28, 2000, Dr. Reynol Suarez performed a vaginal delivery. Dr. James Goodrich, a pediatric surgeon, surgically removed the 2.5-centimeter occipital encephalocele and repaired the skull two days later.

Plaintiff, through Dr. Chen, a board-certified pediatric neurologist, claims the following departures occurred. First, defendants did not properly manage plaintiff's diabetes during the first trimester of her pregnancy by not continuing her on insulin; second, the radiology defendants did not identify the encephalocele to enable in utero treatment; and third, the delivery should have been performed by cesarean section in order to avoid what Dr. Chen contends was compression or rupture of the encephalocele. While Dr. Chen acknowledges that the failure of the neural tube to close is or results from a brain malformation or defect that occurs sometime between the 28th and 33rd day of gestation, he opines that since the encephalocele continues to develop and grow gradually throughout the first 10 to 12 weeks of gestation its further growth and development was caused or exacerbated by the failure to treat plaintiff's diabetes properly, and is responsible for the extent of the infant's impairment. Dr. Chen further claims that the vaginal delivery caused the encephalocele to rupture, which in turn caused brain fluid to leak or unnecessary pressure to be put on the mass, resulting in additional neural damage.

Defendants agree that the child of a diabetic mother has an increased risk of a neural tube failure and consequently of developing an encephalocele. However, defendants claim that plaintiff cannot establish under any generally accepted medical or scientific standard that either the growth of or the failure to identify or diagnose the encephalocele during the pregnancy caused any injury to the infant. They claim that all of the infant's injuries and deficits were caused by the neural tube failure, which occurred at the latest on the 33rd day of gestation and before plaintiff came under their care. They assert as

follows: first, plaintiff did not come under defendants' care related to her pregnancy until December 3, 1999, approximately 40 days into her pregnancy; second, the encephalocele's continued growth did not affect the outcome for the infant; and third, a vaginal delivery is not contraindicated by the presence of an encephalocele. Moreover, they contend that the encephalocele did not rupture and was not compressed during the delivery and, in any event, the alleged compression or rupture was of no moment because the growth contained no functional brain tissue. Defendants contend that, in claiming that Dr. Suarez should have performed a cesarean section, Dr. Chen confuses an encephalocele with a myelomeningocele, a different congenital disorder affecting the spine. In the latter case, a cesarean section is advised.

Doctors Umali and Park, the NYMG physicians who first cared for plaintiff, have settled with plaintiff for $4,000,000, and NYMG has also settled for an undisclosed amount. The remaining defendants, WHAECOM and Doctors Girz, Jarosz, Berger, and Suarez, contend that their actions played no role in the encephalocele's development or growth, that the neural tube failure alone caused the infant's injury, that the encephalocele that resulted from the neural tube failure was not the cause of any injury, and that there were no departures in obstetrical care during the delivery. In sum, they claim that nothing they did affected plaintiff's well-being.

Dr. Chen opines that, after the neural tube failure, an encephalocele continues to develop over the first 10 to 12 weeks of gestation and that the growth of the encephalocele, in addition to the neural tube defect which caused it to develop, was a substantial factor in causing the infant's neurological injuries. In other words, he posits a "two-hit" causation theory: first the neural tube failure occurs and then the encephalocele develops, both of which contribute to neurological damage. As part of that two-hit hypothesis, Dr. Chen opines that the "trauma to the [infant's] encephalocele sustained during his vaginal birth was a competent producing cause of [some of] his subsequent injuries." Dr. Chen believes that the brain was exposed to various fluids (including amniotic fluid and cerebrospinal fluid) as a result of an unclosed neural tube, which increased the infant's injuries. He further theorizes that intrauterine repair or removal of an encephalocele can reduce the exposure of a fetus to amniotic fluid. Dr. Chen refers to and appends abstracts of studies by pediatric neurosurgeons Noel Tulipan, M.D., and George

Jallo, M.D., obstetrician Joseph Bruner, as well as those of pediatric neural-radiologist Ian Turnbull, M.D., to support these theories. In support of his general theory of progressive neurological deterioration caused by hydrocephalus or leaky fluid, Dr. Chen invokes works by pediatric neurosurgeon Richard G. Ellenbogen, M.D. Finally, Dr. Chen invokes a work by obstetrician D.A. Luthy to support his claim that infants with encephaloceles do better if delivered by cesarean section than if delivered vaginally. Dr. Chen bases his conclusion that the encephalocele was ruptured or compressed during birth on an observation of fluid leakage found in the neonatal chart. He also notes that the pathology report of the removed encephalocele showed the presence of still living neural tissue. He thus concludes that the vaginal delivery caused further damage.

In reply, the moving defendants submit affidavits by the authors of the articles and texts that Dr. Chen cites that pertain to causation. Dr. Tulipan, pediatric neurosurgeon at the Children's Hospital at Vanderbilt Medical Center, states that "Dr. Chen cites to my article *Fetal Surgery for Myelomeningocele and the Incidence of Shunt-Dependent Hydrocephalus* for the proposition that secondary neurological damage occurs as a result of an encephalocele being exposed to amniotic fluid . . . This is a patently false assertion . . . not supported by my article, or any other medical literature." He further states:

> "My article pertained to in-utero surgical repair of a myelomeningocele, and is entirely irrelevant in the context of an encephalocele . . . With [a myelomeningocele], the spinal cord is contained in the surface of the protruding sac, thus resulting in exposure of the spinal cord to amniotic fluid, as well as to direct trauma from contact with the uterine wall and birth canal. This is entirely different than an encephalocele, which consists of non-functioning brain tissue, meninges and cerebrospinal fluid contained in a covered sac . . . The purpose of my article was to address the hypothesis whether intrauterine repair of a myelomeningocele can improve an infant's outcome by decreasing spinal cord exposure to amniotic fluid . . . [T]he '[two]-hit' hypothesis is irrelevant to an encephalocele because, unlike a myelomeningocele, an encephalocele is not exposed to amniotic fluid."

Dr. Richard G. Ellenbogen, board certified in pediatric neurological surgery, chair of neurosurgery at the University of

Washington School of Medicine, and chief of neurological surgery at Seattle Children's Hospital, also rejects Dr. Chen's causation theories. He states that the development of the encephalocele, which occurs after the neural tube fails to close at 26 to 28 days of gestation, is irrelevant to an infant's neurological outcome inasmuch as the encephalocele contains non-functioning brain tissue. Dr. Ellenbogen asserts that his discussion of the two-hit hypothesis in the cited article, *Neural Tube Defects in the Neonatal Period*, applies to anencephaly and myelomeningoceles but not to encephaloceles, which are covered by skin and not exposed to amniotic fluid. To the contrary, a myelomeningocele is an open defect located outside the spinal cord, and it can be exposed to amniotic fluid. Additionally, Dr. Ellenbogen states that an encephalocele is a manifestation of a preexisting malformed brain and that the malformation and not the encephalocele causes neurological dysfunction.

Similarly, Dr. George Jallo, clinical director of pediatric neurosurgery and director of the neurosurgical residency program at Johns Hopkins Hospital, and professor of neurological surgery, pediatrics and oncology at Johns Hopkins School of Medicine, submits an affidavit in support of the motion in limine. He states that "Dr. Chen incorrectly cites my article *Neural Tube Defects* in the context of promulgating several false theories which are not medically or scientifically accepted or supported. My article in fact lends no support for any of Dr. Chen's false theories." He adds that neural tube defects occur no later than the first 26 to 33 days of gestation, and that the development of the encephalocele during pregnancy is irrelevant because it is non-functioning brain tissue. According to Dr. Jallo, the "damage to the fetus is pre-determined by the 26 to 33 day period, and there is no further treatment, pre or post delivery that can alter the infant's neurological outcome." The claim that secondary neurological damage occurs after 33 days is a "patently false assertion." Dr. Jallo agrees with defendants' other experts that unlike a myelomeningocele, an encephalocele is not exposed to amniotic fluid because the protruding tissue is covered by skin.

Doctor Deborah Levine is the director of obstetric and gynecological ultrasound, and co-chief of ultrasound at the Beth Israel Deaconess Medical Center, a teaching hospital of Harvard Medical Center. Dr. David A. Luthy is the director of perinatal medicine and medical director of obstetrics and gynecology at the Swedish Hill Medical Center in Seattle, as well as clinical

professor at the University of Washington School of Medicine. These doctors furnished affidavits attesting to the falsity of Dr. Chen's claims that delivery by cesarean section of infants with encephaloceles has been shown to result in better motor function than in those infants born vaginally or that the presence of an encephalocele mandates a cesarean section. Their articles advocating cesarean sections relate to myelomeningoceles and refer to decreased neural function in children with myelomeningoceles, not those with encephaloceles.

Defendants submit a number of other expert affidavits, including those of Dr. Jeffrey Wisoff, pediatric neurologist at New York University, Dr. Mary Loeken, physiology/reproductive endocrinologist at the Harvard University Medical School, Dr. Adiel Fleischer, obstetrician at Long Island Jewish Medical Center, Dr. Ian Holzman, perinatologist at Mount Sinai Hospital, and Dr. Carol Benson, director of ultrasound and high risk obstetrical ultrasound at Boston's Brigham and Women's Hospital. All of these experts opine that no aspect of the care given to plaintiff during her pregnancy caused or in any way exacerbated the infant's neurological condition.

With respect to the claim that the vaginal delivery caused neurological injury, Dr. James Goodrich, the board-certified neurological surgeon who removed the infant's encephalocele, affirmed that the growth consisted of non-functioning brain tissue with no neuron involvement and the mode of delivery had no impact on it. Moreover, Dr. Goodrich notes that the pathology report did not disclose the presence of spinal fluid, which was the basis for Dr. Chen's contention that a rupture had occurred. Dr. Goodrich stated that the encephalocele was not large enough to have been compressed during the vaginal delivery, but added that "even assuming there is pressure or trauma to the encephalocele, it would not adversely impact the infant's neurological abilities."

Plaintiff's experts, in addition to Dr. Chen, include an expert in diabetes, an obstetrician, a roentgenologist, and a neonatologist. These physicians opine as to defendants' alleged departures, but they do not set forth any basis for finding that these departures caused injury. In other words, even assuming all of those departures occurred, the very articles cited by Dr. Chen as well as the other medical evidence submitted by defendants demonstrate that the neural tube failure occurred before plaintiff came under their care, and it was the sole cause of the infant's neurological deficits. Whether or not the alleged

departures caused the continued growth of the encephalocele, there is no credible evidence demonstrating that the growth of the encephalocele in any way caused or exacerbated the brain damage.

[1] Thus, we conclude, the denial of defendants' motions for summary judgment does not preclude consideration of the motion in limine. We note that in a summary judgment motion the defendant has the initial burden of proof that no issues of fact exist (*Alvarez v Prospect Hosp.*, 68 NY2d 320 [1986]). In a motion such as the one before us now, which seeks an evidentiary ruling concerning the reliability of specific proposed expert testimony, the party offering expert testimony bears the burden of demonstrating its reliability where a credible challenge to the underpinning of the expert theory has been raised (*Saulpaugh v Krafte*, 5 AD3d 934 [3d Dept 2004], *lv denied* 3 NY3d 610 [2004]; *Lara v New York City Health & Hosps. Corp.*, 305 AD2d 106 [1st Dept 2003]). Here, plaintiff successfully opposed the summary judgment motions by submitting an expert affidavit stating that defendants' medical treatment departed from good and accepted practice and by citing various treatises that allegedly supported his theories as to departures and tangentially to causation. Whether plaintiff's theories that the alleged departures could cause injury had any generally accepted scientific basis was not squarely before the court on summary judgment, and it was not in a position to evaluate the reliability of those theories.

■ Based on the above, the preclusion of plaintiff's expert testimony was a proper exercise of the motion court's discretion. Supreme Court correctly determined that none of plaintiff's theories of causation is generally accepted in the relevant medical or scientific community, correctly precluded plaintiff's experts from offering evidence concerning any injury occurring after the first 28 to 33 days of gestation, and properly dismissed the complaint.

[3] In addition, the motion court properly granted defendants' motion to strike plaintiff's supplemental bill of particulars and plaintiff's motion for leave to renew and reargue. Ten years after the events and seven or eight years into the litigation, plaintiff submitted a supplemental bill of particulars, which asserted a new theory, namely, that the infant, whose Apgar scores were 9/9, sustained a hypoxic event during delivery, which caused some of his impairment. The trial court properly denied leave to supplement the bill of particulars because it asserted a

new theory of liability seven years after the action was commenced and after a summary judgment motion had been litigated focusing on the theories plaintiff had set forth in her original pleading and bills of particulars (*see Wolfer v 184 Fifth Ave. LLC*, 27 AD3d 280 [1st Dept 2006]; *Licht v Trans Care N.Y.*, 3 AD3d 325 [1st Dept 2004]). Contrary to plaintiff's contention, the supplement was not mere "amplification," but referred to injuries that were not mentioned in the previous bills of particulars or in any affidavit served on defendants before 2010, and defendants had therefore not addressed these injuries (*see Markarian v Hundert*, 262 AD2d 369 [2d Dept 1999]). Plaintiff's assertion that her medical expert only alerted her to the new theory of liability in 2008 does not excuse the untimely amendment (*id.*).

Finally, leave to renew and reargue was properly denied. The additional affidavits that plaintiff submitted in connection with the motion fail to demonstrate that there is any scientific basis for plaintiff's theory of causation.

Accordingly, the order of the Supreme Court, Bronx County (Stanley Green, J.), entered June 10, 2011, which granted defendants' motion pursuant to *Frye v United States* (293 F 1013 [DC Cir 1923]) to preclude plaintiff from offering evidence that a neural tube defect develops gradually over the first 10 to 12 weeks of gestation, that the infant's encephalocele is a cause of his neurological damage, and that rupture/trauma of an encephalocele during a vaginal delivery caused or exacerbated the infant's neurological damage, and thereupon dismissed the case, should be affirmed, without costs. The order of the same court and Justice, entered on or about June 10, 2011, which granted defendants' motion to strike plaintiff's supplemental bill of particulars, should be affirmed, without costs. The order of the same court and Justice, entered on or about September 14, 2011, which, inter alia, denied plaintiff's motion to renew defendants' *Frye* motion, should be affirmed, without costs.

Tom, J.P., Sweeny, Renwick and Abdus-Salaam, JJ., concur.

Order, Supreme Court, Bronx County, entered June 10, 2011, and orders, same court, entered on or about June 10, 2011, and on or about September 14, 2011, affirmed, without costs.