Huntley v New York City Health & Hosps. Corp. (2026 NY Slip Op 50108(U))

[*1]

Huntley v New York City Health & Hosps. Corp.

2026 NY Slip Op 50108(U)

Decided on February 2, 2026

Supreme Court, New York County

Kingo, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 2, 2026
Supreme Court, New York County

Natalie Huntley, Plaintiff,

againstNew York City Health and Hospitals Corporation, Defendant.

Index No. 805150/2021

Plaintiffs: Gerhardt Meter Nielsen, Esq. Pegalis Law Group, LLCDefendant: Alexandra Nicole Nieto, Esq. Barker Patterson Nichols, LLP

Hasa A. Kingo, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75 were read on this motion for SUMMARY JUDGMENT
Defendant New York City Health and Hospitals Corporation ("NYCHHC") moves, pursuant to CPLR § 3212, for summary judgment dismissing the complaint in its entirety. Plaintiff Natalie Huntley ("Huntley"), individually and as administrator of the estate of Devon J. Hyman (the "decedent") (collectively, "plaintiffs"), opposes the motion, contending that although defendant may have tendered expert proof sufficient to satisfy its prima facie burden, material issues of fact remain as to departures from accepted medical practice and proximate cause, thereby precluding judgment as a matter of law.BACKGROUND AND PROCEDURAL HISTORYThis medical malpractice and wrongful death action arises out of the care rendered to decedent during his hospitalization in March 2020 at NYCHHC facilities. The parties' motion papers reflect that decedent presented with chest pain and was diagnosed with a Stanford Type B aortic dissection,[FN1]
and that vascular and surgical services were involved in determining the [*2]appropriate course of management.
NYCHHC's submissions further reflect that, given the absence of proximal extension or rupture at the time of initial evaluation, the dissection was managed medically with blood pressure and impulse control (including intravenous beta blockade and related therapies) and that decedent was transferred to a higher-acuity facility for ongoing monitoring because Type B dissections carry recognized risks of progression and rupture.
Plaintiffs contend that during the hospitalization, particularly in the hours preceding the cardiopulmonary event, decedent exhibited a trajectory of worsening respiratory status and clinical distress that required timely escalation of care and diagnostic evaluation, and that the failure to do so permitted a preventable deterioration culminating in pulseless electrical activity ("PEA") arrest, hypoxic injury, and death.
The record cited in the opposition includes testimony that, in the overnight period before the arrest, decedent was increasingly restless, uncomfortable, diaphoretic, and complained of difficulty breathing. Plaintiffs further cite contemporaneous ICU data and subsequent airway findings to support their theory that the deterioration was neither instantaneous nor clinically inscrutable, but rather preceded by objective signs requiring action.
NYCHHC submits expert affirmations, including from Mark S. Silberman, M.D. (critical care/pulmonary) and Michael Argenziano, M.D. (cardiothoracic surgery), opining that the care complied with accepted practice and that nothing done or omitted by NYCHHC proximately caused the arrest, subsequent deterioration, or death.

ARGUMENTS
NYCHHC argues that it is entitled to summary judgment because its expert proof establishes, prima facie, both the absence of departures and the absence of proximate causation. NYCHHC emphasizes that (i) medical management of a Type B dissection is appropriate in the absence of proximal extension or rupture and was timely implemented; (ii) decedent's demise resulted from a rare, sudden, and unpredictable complication that could not have been predicted or prevented; and (iii) plaintiffs' theories depend on impermissible hindsight and speculation and therefore cannot defeat summary judgment.
NYCHHC also invokes recent Appellate Division, First Department, precedent stating that, although conflicting expert opinions often preclude summary judgment, expert opinions that are speculative, unsupported by an evidentiary foundation, or contradicted by the record are afforded no probative force (Richardson v Ky, 236 AD3d 609 [1st Dept 2025]).
With respect to informed consent, NYCHHC contends that the claim is legally deficient because plaintiffs do not identify a qualifying invasive diagnostic procedure or non-emergency treatment/procedure performed without adequate disclosure, and instead premise the claim on an alleged failure to diagnose or treat.
Plaintiffs argue that NYCHHC's motion must be denied because (a) defendant has not eliminated all triable issues, and (b) plaintiffs' experts raise material issues as to departures and causation. Plaintiffs emphasize that summary judgment is not appropriate in a medical [*3]malpractice case where parties adduce conflicting medical opinions and the dispute necessarily turns on credibility and competing inferences drawn from the clinical record (Griffin v Cerabona, 103 AD3d 420, 421 [1st Dept 2013]).
On the merits, plaintiffs contend that the record demonstrates progressive respiratory compromise prior to the arrest, despite escalating oxygen support, and that accepted medical practice required prompt investigation into the cause of the hypoxia and timely escalation of ventilatory support. Plaintiffs cite objective oxygen saturation data flagged as abnormal and note that the decedent was maintained overnight on a high-flow nasal cannula at progressively increasing flow rates.
Plaintiffs further point to post-arrest airway findings, including "copious" pink, frothy fluid in the endotracheal tube, as corroborative evidence of pulmonary edema or aspiration physiology that, in their view, should have been evaluated and addressed prior to the arrest.

DISCUSSION
A motion for summary judgment "shall be granted if, upon all the papers and proofs submitted, the cause of action or defense shall be established sufficiently to warrant the Court as a matter of law in directing judgment in favor of any party" (CPLR § 3212[b]). "The proponent of a motion for summary judgment must demonstrate that there are no material issues of fact in dispute, and that it is entitled to judgment as a matter of law" (Dallas-Stephenson v Waisman, 39 AD3d 303, 306 [1st Dept 2007]). The movant's burden is "heavy," and "on a motion for summary judgment, facts must be viewed in the light most favorable to the non-moving party" (William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475 [2013][internal quotation marks and citation omitted]). Upon proffer of evidence establishing a prima facie case by the movant, the party opposing a motion for summary judgment bears the burden of producing evidentiary proof in admissible form sufficient to require a trial of material questions of fact (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). "A motion for summary judgment should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility" (Ruiz v Griffin, 71 AD3d 1112, 1115 [2d Dept 2010][internal quotation marks and citation omitted]). 
To sustain a medical malpractice cause of action, a plaintiff must prove two essential elements: "(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (Frye v Montefiore Med. Ctr., 70 AD3d 15, 24 [1st Dept 2009]). A defendant establishes prima facie entitlement to summary judgment when it demonstrates that there was no departure from good and accepted medical practice, or that any departure was not the proximate cause of the injuries alleged (Roques v Noble, 73 AD3d 204, 206 [1st Dept 2010]).
Once a defendant has met that burden, the burden shifts to the plaintiff to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact requiring a trial (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Mere conclusory allegations of malpractice, unsupported by competent evidence tending to establish the essential elements, are insufficient to defeat summary judgment (Alvarez, 68 NY2d at 325).
At the same time, where the parties adduce competing expert opinions grounded in the record, summary judgment is generally inappropriate because the resolution depends upon [*4]credibility determinations and the evaluation of competing inferences—matters reserved for the jury (Griffin, 103 AD3d at 420-421). That general proposition is not absolute: expert opinions that are speculative, lack an evidentiary foundation, or are contradicted by the record may be afforded no probative force (Richardson, 236 AD3d 609). The court's task on this motion is therefore a careful one: to determine not which expert is more persuasive, but whether the nonmovant's proof is legally sufficient and record-grounded so as to raise material factual disputes requiring a trial.
I. NYCHHC's Prima Facie ShowingNYCHHC's experts opine, within a reasonable degree of medical certainty, that the care rendered comported with accepted medical practice in the evaluation and medical management of a Type B aortic dissection, including appropriate blood pressure and impulse control, consultation and monitoring, and transfer to a higher level of care at a facility with surgical capability. They further opine that the decedent suffered a rare and fatal complication that could not have been predicted or prevented, and that it cannot be concluded, without resort to speculation, that different or additional care would have produced a better outcome.
This is sufficient to shift the burden to plaintiffs (Roques, 73 AD3d at 206; Alvarez, 68 NY2d at 324).
II. Plaintiffs Raise Triable Issues of FactThe court nevertheless concludes that plaintiffs have raised material issues of fact requiring a jury's resolution. The decisive feature of this record is not a bare "battle of experts," but rather that plaintiffs' experts identify specific, time-bounded clinical data and record events that, if credited, support a finding that decedent's deterioration was preceded by objective warning signs and that accepted practice required timely investigation and escalation.
Plaintiffs' expert proof describes a clinically significant overnight deterioration. The cited ICU data reflects that, between midnight and 4:00 a.m., decedent's oxygen saturations were repeatedly recorded in the low 90s (91%, 92%, 93%) and flagged by the hospital's own EMR system as "Abnormal!" At the same time, the record reflects escalating oxygen delivery via high-flow nasal cannula: from 40 liters per minute to 55 liters per minute—levels the expert characterizes as providing an effective FiO of 100%.
From that evidence, plaintiffs' critical care expert draws a concrete, non-conclusory inference: that a declining saturation despite maximum and escalating supplemental oxygen constitutes concerning evidence of impending respiratory crisis, requiring immediate evaluation and escalation of respiratory support (including consideration of noninvasive positive pressure ventilation or timely intubation).
NYCHHC, by contrast, argues that decedent was "responding" to oxygen because saturations remained "in the 90s," and that there were no objective signs requiring mechanical ventilation.
That contention, however, underscores why summary judgment is inappropriate: it depends on an evaluative medical judgment—what constituted "adequate" oxygenation in context, and whether the combination of (i) an escalating oxygen requirement to the point of high-flow at 55 L/min, (ii) repeated low-90s saturations flagged as abnormal, and (iii) reported distress symptoms required escalation and further workup. Those are not purely legal determinations; they are medical determinations that a jury must assess through expert [*5]testimony.
The record also contains lay testimony consistent with clinical distress during the relevant period, including restlessness, diaphoresis, discomfort, and difficulty breathing, which a factfinder could consider together with the objective data in evaluating whether the providers should have recognized a deteriorating clinical picture.
Plaintiffs' experts do not merely assert that "more should have been done." They identify specific diagnostic steps they contend were required by accepted practice—repeat chest imaging (x-ray, ultrasound, or CT) in the hours between midnight and 4:15 a.m. to determine the etiology of worsening hypoxia despite maximal high-flow oxygen.
NYCHHC argues that such opinions are retrospective and speculative. But plaintiffs' proof ties the need for imaging to an articulated clinical trigger (the unexplained fall in SpO despite escalating oxygen delivery). That framing is important: it moves the opinion from outcome-driven hindsight to contemporaneous clinical decision-making.
Moreover, plaintiffs cite post-arrest airway findings, including "copious" pink, frothy fluid in the endotracheal tube, as record support for the plausibility of pulmonary edema physiology contributing to respiratory failure, and thus for the contention that pulmonary edema should have been considered and evaluated before the arrest. NYCHHC disputes that inference, contending there were no pre-arrest signs supporting pulmonary edema, and criticizing plaintiffs' language (e.g., "suggests," "likely") as insufficiently definite.
That dispute again is not resolvable on summary judgment without weighing expert credibility. Plaintiffs' experts point to a concrete post-event finding in the record and explain why that finding supports an inference about pre-arrest physiology and the need for imaging and escalation.
NYCHHC's experts offer a different interpretation. This is precisely the situation where "resolution of issues of credibility of expert witnesses and the accuracy of their testimony are matters within the province of the jury" (Griffin, 103 AD3d at 420-421).
NYCHHC contends that plaintiffs cannot demonstrate causation without speculation, and relies on authority holding that speculative expert opinions are insufficient to withstand summary judgment (Richardson, 236 AD3d 609). NYCHHC also cites cases requiring that an expert's affirmation convey assurance that the opinion is not based on "supposition or speculation" (Matott v Ward, 48 NY2d 455, 459—460, 463 [1979]). The court does not quarrel with those principles. But applying them requires attention to what plaintiffs actually submit.
Here, plaintiffs' causation theory is not framed as mere possibility. It is framed as a chain of events anchored to a defined time window and defined interventions: (i) oxygen saturations declined after midnight and were repeatedly abnormal despite escalation to high-flow oxygen; (ii) accepted practice required prompt evaluation of the cause and escalation of ventilatory support; and (iii) had those steps been undertaken when the decline was first apparent, the arrest would have been avoided.
Whether that causal claim is ultimately persuasive is not for the court to decide on papers. The question at summary judgment is whether plaintiffs' proof, if credited, supports a non-speculative inference of causation within a reasonable degree of medical certainty.
On this record, it does. Plaintiffs tie their "avoidance" opinion to a clinical mechanism (preventing progression to respiratory failure and cardiopulmonary arrest through timely ventilatory support and management of the underlying etiology), and they connect it to record evidence demonstrating a period of deterioration rather than a wholly instantaneous collapse.
NYCHHC argues that decedent's saturations were "in the 90s" and thus that there was no objective need for mechanical ventilation. That argument again highlights the factual dispute. A jury could find that saturations in the low 90s on effectively maximal oxygen delivery, flagged as abnormal and worsening after midnight, represent clinical instability requiring action.
A jury could also credit NYCHHC's contrary view. But where the resolution depends on medical judgments and the weight to be given to competing expert interpretations of the clinical data, summary judgment is inappropriate (Griffin, 103 AD3d at 420-421).
Plaintiffs' cardiothoracic expert also opines that increased intra-abdominal pressure related to the dissection/hematoma may have contributed to respiratory compromise, and that abdominal distention and work of breathing were consistent with elevated intra-abdominal pressure, which should have been investigated through readily available means (e.g., bladder pressure monitoring). NYCHHC disputes this. The dispute further confirms that causation and departure issues in this case are intertwined with clinical interpretation and competing inferences from record signs and symptoms—again calling for a jury's evaluation.
NYCHHC's best point is that certain formulations in plaintiffs' expert affirmations use probabilistic language ("likely," "suggests"), and NYCHHC invokes authorities such as Richardson, supra, discussing insufficient certainty and retrospective reasoning.
The court agrees that a plaintiff cannot defeat summary judgment with conclusory or speculative expert opinions (Alvarez, 68 NY2d at 325). But the court cannot—and will not—excise isolated words from a longer, record-anchored opinion and treat the entire submission as legally void. Plaintiffs' experts identify specific objective data (overnight abnormal SpO values; escalation to high-flow oxygen at 55 L/min; absence of repeat imaging despite deterioration; post-arrest findings of copious pink frothy fluid) and explain why those data support the clinical assessment, the asserted departures, and the causal pathway.
That is sufficient to raise issues of fact. As the Court of Appeals has explained, summary judgment is not a vehicle for the court to resolve competing expert opinions where each side's proof provides an evidentiary foundation (Alvarez, 68 NY2d at 324).
Accordingly, although NYCHHC has made a prima facie showing, plaintiffs have rebutted it with competent proof raising triable issues of fact regarding (i) whether NYCHHC departed from accepted practice in recognizing and responding to a trajectory of respiratory decline; (ii) whether appropriate diagnostic evaluation and escalation were timely undertaken; and (iii) whether the asserted departures were substantial factors in bringing about the arrest and subsequent injury. Those issues must be resolved at trial.
NYCHHC also seeks dismissal of the third cause of action sounding in lack of informed consent under Public Health Law § 2805-d. That statute limits such claims to non-emergency treatment/procedure/surgery or a diagnostic procedure involving invasion or disruption of bodily integrity. The Appellate Division, First Department, has held that "[a] failure to diagnose cannot be the basis of a cause of action for lack of informed consent unless associated with a diagnostic procedure that 'involves invasion or disruption of the integrity of the body'" (Janeczko v Russell, 46 AD3d 324, 325 [1st Dept 2007]; see also Lewis v Rutkovsky, 153 AD3d 450 [1st Dept 2017]).
And where, as here, a plaintiff fails to identify a qualifying invasive diagnostic procedure performed without consent, the informed consent claim must be dismissed (Ford v Lee, 203 AD3d 456, 458 [1st Dept 2022]). Plaintiffs' theory, as framed in the motion record, sounds in alleged failures to diagnose, investigate, and treat—not in a lack of disclosure concerning an [*6]identified invasive diagnostic procedure or non-emergency treatment performed.
Accordingly, that cause of action is dismissed as a matter of law.
In closing, NYCHHC has made a prima facie showing of entitlement to summary judgment on the medical malpractice and wrongful death claims (Roques, 73 AD3d at 206). Nevertheless, plaintiffs have raised triable issues of fact grounded in record evidence and competing expert interpretations, thus precluding summary judgment on those claims (Griffin, 103 AD3d at 420-421). NYCHHC is, however, entitled to summary judgment dismissing the lack of informed consent claim (Ford, 203 AD3d at 456-458; Janeczko, 46 AD3d at 324-325).
Accordingly, it is hereby:
ORDERED that defendant NYCHHC's motion for summary judgment (Motion Seq. 001) is granted solely to the extent that the third cause of action for lack of informed consent is dismissed; and it is further
ORDERED that the motion is otherwise denied; and it is further
ORDERED that counsel shall appear for the previously scheduled pretrial conference on Tuesday, February 10, 2026, at 9:30 a.m., at 60 Centre Street, Part 40, Room 252, New York, New York; and it is further
ORDERED that counsel shall also appear for the scheduled trial date on Tuesday, April 28, 2026, at 9:30 a.m., at 60 Centre Street, Part 40, Room 252, New York, New York; and it is further
ORDERED that, if the parties wish to discuss settlement in Part 65, they shall contact the court at [email protected] and [email protected], copying all counsel, to express their interest in doing so.
This constitutes the decision and order of the court.
DATE 2/2/2026HASA A. KINGO, J.S.C.

Footnotes

Footnote 1: Stanford Type B aortic dissection is a life-threatening medical condition where a tear occurs in the descending portion of the aorta, distal to the left subclavian artery. Unlike Type A, which involves the ascending aorta closer to the heart, Type B is restricted to the descending thoracic or abdominal aorta.