Barry v Lee (2019 NY Slip Op 09397)





Barry v Lee


2019 NY Slip Op 09397


Decided on December 26, 2019


Appellate Division, First Department


Manzanet-Daniels, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 26, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels, J.P.
Peter Tom
Barbara R. Kapnick
Ellen Gesmer
Anil C. Singh, JJ.


10357 

[*1]Mamidou Barry, as Administrator of the Estate of Mariama Bah, Plaintiff-Appellant,
v
Christopher C. Lee, M.D., et al., Defendants-Respondents.



Plaintiff appeals from a judgment of the Supreme Court,
Bronx County (Joseph E. Capella, J.), entered April 16, 2019, dismissing the complaint, and bringing up for review an order, same court and Justice, entered March 29, 2019, which granted defendants' motion for summary judgment dismissing the complaint.




Landers & Cernigliaro, P.C., Carle Place (Stanley A. Landers of counsel), for appellant.
Wilson Elser Moskowitz Edelman & Dicker LLP, New York (Judy C. Selmeci of counsel), for respondents.



MANZANET-DANIELS, J.


Plaintiff's expert affidavit raises triable issues of fact that cannot be resolved on this motion for summary judgment.
The 37-year-old decedent was a mother of six who had recently given birth. She was admitted to defendant Bronx-Lebanon Hospital Center before noon on February 8, 2017. Defendant Dr. Lee diagnosed her soon thereafter as suffering from a pulmonary embolism, an acute condition requiring prompt emergency treatment. She was both tachycardic and tachypnic and complained of dizziness and shortness of breath. She remained tachycardic, which is an indicator that a patient is hemodynamically unstable, during the entire time she was at the [*2]hospital. The dissent assumes that because decedent's systolic blood pressure was above 90 that she was "hemodynamically stable," apparently misapprehending the term [FN1]. Decedent was exhibiting signs of distress including a rapid heartbeat, an elevated rate of breathing, and shortness of breath, all signs of an effort to maintain oxygenation [FN2].
Despite the prognosis, staff waited hours for blood tests and an angiogram to confirm the diagnosis. The staff did not administer tissue plasminogen activator (tPA), which can dissolve clots and open arteries in 10-15 minutes. While defendants' expert opined that it would have been inappropriate to administer tPA based on decedent's blood pressure readings, plaintiff's expert squarely disagreed. Defendants' main premise is that tPA, which has the potential to create uncontrollable bleeding, is contraindicated for a patient who is already bleeding; however, neither Dr. Lee nor defendants' expert ever stated that tPA was contraindicated for decedent because she had reported postpartum bleeding.
Dr. Lee testified that, although there is a six-hour window within which tPA must be given following the appearance of symptoms, he did not order it in decedent's case even after receiving CT scan test results confirming his initial differential diagnosis that decedent had a pulmonary embolism because "[w]e do not, as physicians, give tPA for PE [pulmonary embolism]." Dr. Lee did not expand on this testimony, but its plain inference is that his practice was not to administer tPA for pulmonary embolism under any circumstance.[FN3]
At 3:59 — nearly four hours after she arrived at the emergency department — decedent was [*3]put on heparin, a drug that prevents clots but cannot quickly dissolve them. Defendants' expert attempts to explain the delay in administering heparin by opining that staff was awaiting the results of blood tests to rule out clotting risks. Those tests, which were normal, were reported 1½ -2½ hours before staff began administration of heparin [FN4]. To the extent that Dr. Lee may have meant, but did not say, that tPA was contraindicated for decedent because she had told him of postpartum bleeding, Dr. Lee testified that he had received decedent's blood test results confirming that she was not anemic approximately 1½ hours before he received the CT scan results confirming his diagnosis of pulmonary embolism. Accordingly, by the time the pulmonary embolism diagnosis was confirmed, he was aware that her postpartum bleeding was not severe enough to cause her to be anemic.
At 4:20, over four hours after she had been admitted to the hospital and diagnosed as suffering from a pulmonary emobolism, decedent became bradycardic and her oxygen saturation level plummeted and she went into cardiac arrest. It was only then, two minutes prior to cardiac arrest, that staff administered tPA. The treatment rendered to decedent, in the words of plaintiff's expert, was "too little too late."
Defendants' expert noted that decedent's elevated D-Dimer assay results were associated with venous thrombosis, but opined that it was appropriate to await confirmation of the diagnosis via CT angiogram. He noted that heparin was ordered by Dr. Lee at 3:29, within five minutes of learning of the results of the angiogram. Defendants' expert opined that treatment of decedent with heparin under the circumstances was appropriate, but conceded that the process of breaking down a clot with heparin "occurs slowly over time, generally taking place over a period of days to weeks." Defendants' expert opined that tPA was not indicated unless a patient had a confirmed diagnosis of pulmonary embolism and persistently less than 90 systolic blood pressure and that decedent was not a candidate for the drug. In his opinion, the benefits of tPA did not outweigh the risks of bleeding and death.
A plaintiff is only required to raise a triable issue of fact as to causation where the defendant makes a prima facie showing that a claimed departure was not a proximate cause of the plaintiff's injuries (see Stukas v Streiter, 83 AD3d 18, 30 [2d Dept 2011]). While defendants' expert opines that treatment of decedent was in accordance with the standard of care, he offers no opinion on causation other than to state that administration of heparin earlier would not have changed the results and that decedent's rapid deterioration and death was not due to any act or omission on the part of defendants. He does not address the proposition that prompt administration of tPA would have increased decedent's chances of survival.[FN5]
The dissent suggests that defendants' expert opined that tPA was contraindicated because of decedent's postpartum bleeding; the dissent, however, relies on a partial quote from defendants' expert's affidavit. The complete sentence is: "The patient reported ongoing vaginal bleeding in her post-partum state, which increased her risk for bleeding complications with Heparin" (emphasis added). This statement has no bearing on whether he believed that tPA was contraindicated.
Since defendants' claim of entitlement to summary judgment rests on their allegation that tPA was contraindicated based on decedent's report of postpartum bleeding, but neither Dr. Lee nor defendants' expert so stated, defendants have failed to make a prima facie showing of entitlement to judgment as a matter of law by establishing the absence of a triable issue of fact as to whether there was a departure from accepted standards of medical practice. Accordingly, plaintiff was not required to present evidence that such a departure was a proximate cause of Ms. Bah's death (see Foster-Sturrup v Long, 95 AD3d 726 [1st Dept 2012]).
Even assuming, arguendo, that defendants made a prima facie case, the affidavit of plaintiff's expert raises triable issues of fact requiring a trial. Plaintiff's expert opined that it was a departure not to order stat blood work after the diagnosis of pulmonary embolism had been made, and a departure not to promptly administer a thrombolytic drug (tPA or similar) to bust the clots that were impeding blood flow to decedent's lungs. She opined that it was a departure to wait three hours for the CT angiogram and a departure not to administer heparin until 3 hours and 46 minutes after the diagnosis of pulmonary embolism had been made. She further opined that decedent's vital signs indicated that she was hemodynamically unstable, making her a candidate for tPA treatment far earlier than she received it. She opined that these departures specifically caused decedent to lose a substantial probability to survive, sufficiently placing both negligence and causation in issue (see e.g. Flaherty v Fromberg, 46 AD3d 743, 745 [2d Dept 2007] ["(a)s to causation, the plaintiff's evidence may be deemed legally sufficient even if its expert cannot quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased his injury, as long as evidence is presented from which the jury may infer that the defendant's conduct diminished the plaintiff's chance of a better outcome or increased his injury"]).
Given the timeline and the delays in administering care (not only in administering tPA, but in administering heparin or other treatment) and the specific departures from the standard of care delineated by plaintiff's expert, it is disingenuous to assert that her opinion is "conclusory" and insufficient to raise an issue of fact as to causation [FN6]. Indeed, the plain import of plaintiff's expert's opinion is that administration of tPA would have dissolved the clot within 10-15 minutes and averted cardiac arrest. A pulmonary embolism blocks the normal flow of blood and is life-threatening for that very reason. Plaintiff's expert's opinion has raised a triable issue of fact as to whether, had defendants acted promptly instead of waiting over four hours to [*4]administer heparin (let alone tPA), this tragic result might have been averted.
Accordingly, the judgment of the Supreme Court, Bronx County (Joseph E. Capella, J.), entered April 16, 2019, dismissing the complaint, and bringing up for review an order, same court and Justice, entered March 29, 2019, which granted defendants' motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, the judgment vacated, defendants' motion denied, and the complaint reinstated. Appeal from the foregoing order, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.
All concur except Tom and Singh, JJ. who dissent in an Opinion by Singh, J.




SINGH, J. (dissenting)


I respectfully dissent as Supreme Court properly granted defendants' motion for summary judgment dismissing the complaint. First, defendants established that decedent's mortality risk from the administration of a thrombolytic drug due to hemorrhage was greater than her mortality risk from a pulmonary embolism before her rapid deterioration. Second, plaintiff fails to address defendants' assertion that decedent's outcome would not have been different if she had been diagnosed with a pulmonary embolism earlier; or had been administered heparin earlier; or had been administered a thrombolytic drug earlier. Third, plaintiff fails to address defendants' detailed evaluation of decedent's risk of death from pulmonary embolism as opposed to her risk of death from hemorrhage if she had been treated with a thrombolytic drug. Finally, plaintiff fails to state that defendants' acts or omissions were a proximate cause of decedent's death, ignoring the issue of causation altogether.
This action arises from the death of a 37-year-old who was admitted to defendant Bronx-Lebanon Hospital Center just after noon on February 8, 2017. Defendant Dr. Lee was the emergency room physician who examined and treated the patient. Among other things, decedent complained of chest pain, dizziness, sudden heart palpitations and shortness of breath. Decedent also noted that she had given birth one month earlier and since then had experienced vaginal bleeding. By 12:13 p.m. decedent was assessed to be experiencing a pulmonary embolism. At that point the hospital records note that she was alert and oriented and no longer in distress.[FN1]
Dr. Lee conducted various tests to confirm that she indeed was experiencing a pulmonary embolism, and her condition was confirmed by 3:29 p.m. Decedent was treated with a heparin injection at 3:59 p.m., followed by a heparin drip which was started at 4:02 p.m. The wait between her confirmed diagnosis at 3:29 p.m. and the commencement of heparin treatment was per "hospital protocol,"[FN2]
which required conducting a number of other relevant tests to confirm a [*5]patient's low risk of hemorrhage. Throughout this process, decedent was reported as in "stable condition" and not in "acute distress."
Shortly thereafter, decedent's condition rapidly deteriorated. At 4:25 p.m., decedent went into cardiac arrest. In response, hospital personnel administered a thrombolytic drug. Decedent was pronounced dead at 5:08 p.m.
The gravamen of plaintiff's medical malpractice claim is that defendants should have promptly treated decedent with a thrombolytic drug, such as tissue plasminogen activator (tPA) or strepokinase, instead of, or in addition to, heparin before she went into cardiac arrest.
Defendants moved for summary judgment supported by an expert affirmation from Dr. Mark Silberman, an internist certified in emergency and pulmonary medicine. Dr. Silberman made a prima facie showing that the decision to treat decedent with heparin and not a thrombolytic drug was not a departure from the standard of care and did not proximately cause decedent's death (Frye v Montefiore Med. Ctr., 70 AD3d 15, 24 [1st Dept 2009]; Foster-Sturrup v Long, 95 AD3d 726, 727-728 [1st Dept 2012]).
Dr. Silberman opined that, given that decedent was hemodynamically stable, was not in acute distress, but had "reported ongoing vaginal bleeding in her post-partum state, which increased her risk for bleeding complications with heparin," it was important "to confirm the presence of [a pulmonary embolism] prior to exposing the patient to the risks posed by Heparin." While the majority notes that this statement just applies to the administration of heparin, it fails to address the remainder of Dr. Silberman's affidavit where he states that "tPA was contraindicated" in decedent's specific case.
Moreover, plaintiff's expert cites to medical journals that also make the same point. Additionally, while the majority is correct in contending that defendants never argue that "tPA was contraindicated based on decedent's report of postpartum bleeding," defendants state that tPA was contraindicated for decedent for a variety of other reasons, including the fact that decedent did not "ha[ve] shock manifested by abnormally low blood pressure, persistently less than 90 systolic," and that she was consistently listed as in "stable condition."
Specifically, Dr. Silberman opined that decedent was not a candidate for treatment with a thrombolytic drug, which undisputedly carries an even greater risk of hemorrhage. Thus, decedent's chance of survival would have actually decreased if she had been administered a thrombolytic drug before her rapid deterioration, because her risk of dying from complications from a hemorrhage would have been greater than her risk of dying from pulmonary embolism. I note that plaintiff's expert fails to discuss or refute this contention, completely ignoring the topic of proximate cause of decedent's death, and her risk of hemorrhage if given tPA.
Dr. Silberman also explained when it would be appropriate to administer a thrombolytic drug, stating that "[t]hese medications are indicated in [a] patient who first had a confirmed diagnosis of pulmonary embolism, and second has shock manifested by abnormally low blood pressure, persistently less than 90 systolic." However, because decedent was hemodynamically stable with consistent normal blood pressure measurements since her admission, presented no labored breathing, was speaking in full sentences up until 4:22 p.m., and exhibited a hemorrhage risk, she "did not meet the criteria for the administration of thrombolytic therapy" as her mortality risk from pulmonary embolism did not supersede the risks presented by a thrombolytic drug.
I do not agree with the majority that Dr. Silberman offered "no opinion on causation," and that he did "not address the proposition that prompt administration of tPA would have [*6]increased decedent's chances of survival." In fact, Dr. Silberman gave a lengthy and detailed discussion on the use of thrombolytics, and concluded that "decedent's rapid deterioration . . . and subsequent death was not to any act or omission on the part of [d]efendants." Most significantly, Dr. Silberman opined that decedent's outcome would not have been different if she had been diagnosed with a pulmonary embolism earlier, had been administered heparin earlier, or had been administered a thrombolytic drug.
Plaintiff opposed summary judgment upon an expert affirmation by Dr. Diane Sixsmith, a physician certified in internal and emergency medicine. She opined that although defendants' diagnosis and course of testing were correct, defendant provided untimely and improper treatment. She disagreed with Dr. Silberman's opinion that a thrombolytic drug was an improper course of treatment, discussing various medical journals that indicated when it was appropriate to administer a thrombolytic. However, she failed to identify how decedent met most of these criteria.
Dr. Sixsmith disagreed that decedent had been hemodynamically stable, stating that "[t]he fact that [decedent's] heart rate, 151 upon admission, remained consistently high is indication that she was hemodynamically unstable." Dr. Sixsmith opines that this was sufficient nexus for defendants to administer a thrombolytic, as "[h]emodynamically unstable PE patients are candidates for treatment with [thrombolytics]."
The majority, seemingly adopting Dr. Sixsmith's implicit rejection of Dr. Silberman's definition of hemodynamically stable, contends that since decedent was tachycardic (with an elevated heartrate), she was hemodynamically unstable "during the entire time she was at the hospital." However, this contention is not supported by the record. Although the majority asserts that I misapprehended the term hemodynamically stable by stating that decedent was hemodynamically stable since her systolic blood pressure remained consistently above 100 from 10:55 a.m. until 4:04 p.m., my definition of the term is supported by the record and is based on the affirmations of both Dr. Silberman and Dr. Sixsmith.
In contrast, the majority resorts to defining the term from a medical source outside the record, and this does not give defendants an opportunity to refute it. Further, I note that Dr. Sixsmith had the opportunity to challenge Dr. Silberman's definition and chose not to do so, tacitly acknowledging the significance of the undisputed fact that decedent's systolic blood pressure remained consistently above 100 from 10:55 a.m. until 4:04 p.m. I note that Dr. Sixsmith quotes from a medical journal that adopts Dr. Silberman's definition that "[t]hrombolytic therapy should be used in patients with Acute PE associated with hypotension (systolic BP <90 mm HG) who do not have a high bleeding risk."
 Dr. Sixsmith opines that since decedent had been administered a thrombolytic drug after suffering cardiac arrest, this indicates that there was never a risk in administering a thrombolytic drug, and the wait in administering one was a departure. She tersely concludes that this departure, among others, was "a cause of injury to [decedent] and specifically caused her to lose a substantial probability to survive."
The majority argues that had defendants acted otherwise, "this tragic result might have been averted," because thrombolytics can "dissolve clots and open arteries in 10-15 minutes." However, there is no support in the record for a conclusion that in decedent's case the prompt administration of a thrombolytic would have increased her chances of survival, which required case-by-case analysis before administering a thrombolytic.
Additionally, the majority contends that the administration of a thrombolytic would have "averted cardiac arrest." There is no support for this statement in the record. Dr. Sixsmith does not reach this conclusion. In fact, Dr. Sixsmith does not even discuss the chances of cardiac arrest or hemorrhage occurring had a thrombolytic or heparin been administered earlier. Instead she simply concludes that the delay in completing testing, paired with the delay in administering [*7]a thrombolytic, and the delay in the administration of heparin, "specifically caused [decedent] to lose a substantial probability to survive [FN3]." This statement far from establishes the requisite nexus between the malpractice allegedly committed and the harm suffered.
Dr. Sixsmith undermines her own assertions by annexing three excerpts from medical articles she relied upon in her assessment. These excerpts clearly state that thrombolytics are appropriate when patients exhibit "a low bleeding risk," and "who do not have a high bleeding risk." Significantly, the articles specifically state that "[p]atients with submassive PE are more challenging, and clinicians must carefully evaluate their clinical trajectory, comorbidities, and bleeding risk before administering thrombolytic therapy . . . [such patients] require case-by-case analysis" as to their course of treatment." Thus, Dr. Sixsmith not only fails to address whether or not decedent met the criteria of a "a low bleeding risk," but also agrees with defendants' case-by-case analysis, simply concluding that the failure to administer thrombolytic drugs "caused [decedent] to lose a substantial probability to survive," without explanation or correlation.
Additionally, Dr. Sixsmith fails to explicitly state that the departures she highlights proximately caused decedent's death, and that decedent would have had a substantial probability of survival had a thrombolytic drug been administered. Dr. Sixsmith does not address Dr. Silberman's detailed evaluation of decedent's risk of death from pulmonary embolism as opposed to her risk of death from hemorrhage if she had been treated with a thrombolytic drug. It is also undisputed that thrombolytics create an increased risk of hemorrhage.
In sum, Dr. Sixsmith's opinion on causation was insufficient to defeat defendants' motion for summary judgment, as her conclusory affirmation fails to address the specific assertions made by Dr. Silberman (see e.g. Foster-Sturrup, 95 AD3d at 728-729 [the plaintiff's expert affirmation failed to raise an issue of fact where it was conclusory and did not adequately address the defendants' expert affirmation]).
Accordingly, Supreme Court's order granting defendants summary judgment should be affirmed.
Judgment, Supreme Court, Bronx County (Joseph E. Capella, J.), entered April 16, 2019, bringing up for review an order,
same court and Justice, entered March 29, 2019, reversed, on the law, without costs, the judgment vacated, defendants' motion denied, and the complaint reinstated. Appeal from the foregoing order, dismissed, without costs, as subsumed in the appeal from the judgment.
Opinion by Manzanet-Daniels, J.P. All concur except Tom and Singh, JJ. who dissent in an Opinion by Singh, J.
Manzanet-Daniels, J.P., Tom, Kapnick, Gesmer, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 26, 2019
CLERK



Footnotes

Footnote 1:Hemodynamic instability is defined as perfusion failure or one or more out-of-range vital sign measurements. Signs of hemodynamic instability include shortness of breath and a rapid heart rate (both of which were exhibited by decedent). Low blood pressure is considered a late sign (see Stedman's Medical Dictionary). Indeed, plaintiff's expert noted that "[t]he fact that Ms. Bah's heart rate, 151 upon admission, remained consistently high is [an] indication that she was hemodynamically unstable."

Footnote 2:The dissents misstates our position. We are not "adopting" either party's position. We merely note that plaintiff has raised questions of fact sufficient to defeat the summary judgment motion, including as to whether the information available to defendants supported a determination that she was hemodynamically unstable, and therefore appropriately treated with a thrombolytic therapy such as tissue plasminogen activator.

Footnote 3:The dissent claims that this is a "mischaracteriz[ation]" of Dr. Lee's testimony, but it is the plain meaning of a direct quote from his sworn testimony, and the opposing writer offers no other possible interpretation of those words. It may be, as discussed below, that Dr. Lee meant something different from what he said, but the dissent also does not identify any additional testimony of Dr. Lee's that clarifies this statement. In any event, to the extent that Dr. Lee's testimony is susceptible of more than one meaning, this further demonstrates a triable issue of fact precluding summary judgment.

Footnote 4:Contrary to the dissent's claim that plaintiff's expert failed to address defendants' claims regarding the risk of hemorrhage, Dr. Sixsmith noted that decedent's blood test results reported at 12:46 p.m. were normal, thus suggesting decedent was not anemic. Similarly, the dissent's claim that Dr. Sixsmith did not address how decedent met the criteria for tPA treatment is incorrect. She noted that the medical literature she cited suggests thrombolytic therapy for patients with acute pulmonary embolism and low bleeding risk, and noted that Dr. Lee's diagnosis of pulmonary embolism and the blood test results met these criteria.

Footnote 5:The dissent states that defendants' expert opined that "decedent's outcome would not have been different if. . . she had been administered a thrombolytic drug." This is inaccurate. While defendants' expert states that decedent was not a candidate for tPA based on her blood pressure readings, as discussed above, he does not state anywhere in the record that administration of tPA, before she went into cardiac arrest, would have made no difference to her outcome.

Footnote 6:The dissent does not dispute that plaintiff's expert's affidavit raises triable issues of fact as to departures from the standard of care.

Footnote 1: Although the majority contends that "[d]ecedent was exhibiting signs of distress . . . to maintain oxygenation," it does not clarify that these signs quickly disappeared and only reappeared at 4:22 p.m., right before she suffered cardiac arrest as evidenced by her medical charts in the record.

Footnote 2:The majority mischaracterizes Dr. Lee's testimony, stating that it was his practice "not to administer tPA for [pulmonary embolism] under any circumstance." However, Dr. Lee said nothing of the sort. He testified that her case did not warrant a thrombolytic. In any event, Dr. Lee's subsequently administrated a thrombolytic when decedent was confirmed to be experiencing a pulmonary embolism and her condition deteriorated.

Footnote 3: The majority argues that the staff "waited hours for blood tests and an angiogram to confirm the diagnosis," and attempts to correlate that with causation. However, Dr. Sixsmith relies on a medical article that states that "[p]atients with submassive PE are more challenging, and clinicians must carefully evaluate their clinical trajectory, comorbidities, and bleeding risk before administering thrombolytic therapy". Notably, plaintiff's expert agrees with Dr. Lee's course of testing, and simply contends that defendants took too long to complete them.