**Hutton v Aesthetic Surgery, P.C.**

2024 NY Slip Op 30482(U)

February 13, 2024

Supreme Court, New York County

Docket Number: Index No. 800030/2011

Judge: John J. Kelley

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. JOHN J. KELLEY**      PART      **56M**

*Justice*

-----------------------------------------------------------------------------X

KATHLEEN HUTTON,

           Plaintiff,

- v -

AESTHETIC SURGERY, P.C., Individually and
doing business as THE AESTHETIC SURGERY
CENTER, ELLIOTT H. ROSE, M.D., Individually
and doing business as THE AESTHETIC
SURGERY CENTER, ALEX M. GREENBERG,
D.D.S., P.C., and ALEX M. GREENBERG, D.D.S.,

           Defendants.

-----------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 800030/2011 |
| MOTION DATE | 11/08/2023 |
| MOTION SEQ. NO. | 012 |

**DECISION + ORDER ON
MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 012) 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 124, 126, 128, 129, 132, 133, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 166

were read on this motion to/for          JUDGMENT - SUMMARY          .

## I. INTRODUCTION

In this action to recover damages for medical and dental malpractice, based on alleged departures from good and accepted medical and dental practice, and lack of informed consent, the defendants Aesthetic Surgery, P.C. (the professional corporation), individually and doing business as The Aesthetic Surgery Center, and Elliott H. Rose, M.D., individually and doing business as The Aesthetic Surgery Center (together the Aesthetic defendants), move pursuant to CPLR 3212 for summary judgment dismissing the complaint insofar as asserted against them. The plaintiff opposes the motion. The motion is denied.

## II. FACTUAL BACKGROUND

The crux of the plaintiff's claims against the Aesthetic defendants is that Rose, a plastic and reconstructive surgeon, departed from good and accepted medical practice on November 17, 2008 in the course of performing plastic surgery upon her. Specifically, he performed a

800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.          Page 1 of 25
Motion No. 012

1 of 25

bilateral fascia lata sling procedure and a bilateral facial advancement procedure for the correction of lip incompetence, as well as a bilateral mini brow lift, upper lid blepharoplasty, and lower lid blepharoplasty with canthopexy.  The plaintiff also alleged that Rose departed from good practice in the course of providing post-operative care.  The plaintiff alleged that, as a consequence of this alleged malpractice, she sustained poor lower lip mobility, excessive display of the lower incisors, depression of the lower mandibular border, elevation of the mentalis muscle, lower lip droop, an excessive gap between the upper and lower lips, right-sided ectropion, left-sided ectropion requiring resuspension of the lateral lid, unnecessary facial sling surgery, and an inability to elevate her central lip.

On May 23, 2005, the plaintiff saw orthodontist Joseph Z. Yousefian, D.M.D., of Bellevue, Washington, for a consultation, at which Dr. Yousefian noted, among other things, that the plaintiff exhibited mandibular asymmetry to the right, caused by early maxillofacial adaptation to bilateral flattening of the condyles, that her chin was shifted one to two millimeters (mm) to the right of the midline, and that she had maxillary transverse hypoplasia, that is, underdevelopment, with a bilateral posterior crossbite.  Dr. Yousefian performed a temporomandibular joint (TMJ) evaluation, and concluded that the plaintiff also exhibited bilateral osteoarthrosis of the TM joints, with evidence of clenching.  Dr. Yousefian documented "[l]ip incompetence and mentalis muscle hyperactivity due to increased lower facial vertical height and excessive vertical height of chin structure."  He presented three options to the patient: to do nothing, to undergo orthodontic treatment with braces or a combination of orthodontics, or to undergo maxillary/mandibular surgery.  On September 20, 2005, ophthalmologist Christopher Kuntz, M.D., of Seattle, Washington, performed eye surgery upon the plaintiff in response to her complaint that her right eyebrow was lower than her left, specifically undertaking a levator advancement ptosis (eyelid droop) repair and an upper eyelid blepharoplasty (eyelid plastic surgery) on the right eye, an internal transblepharoplasty browpexy (brow lift) on the right side, and a repair of brow ptosis with internal suture browpexy

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**                                    **Page 2 of 25**
**Motion No.  012**

2 of 25

from a midforehead approach. According to the Aesthetic defendants, Dr. Kuntz explained the risks of the procedures to the plaintiff, including under-correction, asymmetry, undesired cosmetic change, scarring, and the need for further surgery. The plaintiff apparently was dissatisfied with the results of the surgery.

On January 17, 2006, upon Dr. Yousefian's referral, the plaintiff saw dentist and oral and maxillofacial surgeon L. Douglas Trimble, M.D., D.M.D., in Bellevue, Washington, for an orthognathic (jaw surgery) consultation to discuss possible jaw surgery. Dr. Trimble noted that the plaintiff had skeletal issues, including maxillary hypoplasia, combined with mandibular asymmetry and retrognathia, presenting as a convex profile, lack of upper lip support, lack of chin prominence, lip incompetence, and a shift of the dental midline. On August 8, 2006, the plaintiff underwent surgery with Dr. Trimble, consisting of a multi-piece maxillary osteotomy, bilateral mandibular osteotomy, cheek augmentation with malar implant, and anterior mandibular (chin) osteotomy. In his operative reports, Dr. Trimble described the maxillary LeForte I osteotomy and mandibular bilateral sagittal osteotomies with horizontal mandibular osteotomy that he performed on the plaintiff. At several post-operative visits with Dr. Trimble, the plaintiff reported having difficulty eating, in response to which Dr. Trimble placed elastic bands in front of the skeletal wires. On August 31, 2006, the plaintiff indicated to Dr. Trimble that she was doing well and was starting to get some sensation back. Sometime later in 2006, the plate that Dr. Trimble had placed during surgery broke. The plaintiff returned to Dr. Trimble on December 12, 2006, complaining about fullness and puffiness in her cheeks, that the aesthetics of her chin were unacceptable, that she did not see enough of her maxillary incisors, that she had sustained a malocclusion secondary to the fractured plate, and that she was grinding and clenching her teeth at night, resulting in pain.

Although Dr. Trimble planned to bring the plaintiff back for corrective surgery as soon as possible, on January 16, 2007, she sought a second opinion from Franco Audia, D.D.S., to whom she expressed her concerns regarding the fractured plate, the decreased maxillary

800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.          Page 3 of 25
Motion No.  012

3 of 25

central incisor show, her chin shape, bilateral trigeminal nerve (CNV3) paresthesia, increased facial width, and the costs associated with corrective treatment. The plaintiff nonetheless returned to Dr. Trimble, who, on February 6, 2007, performed corrective performed bilateral sagittal ramus osteotomies, with re-application of the skeletal fixation. She was, however, dissatisfied with the results of Dr. Trimble's corrective surgery, asserting that her teeth were pressed too tightly together on the right side of her mouth, while there was a big open space on the left side of her mouth, and that the shape and placement of made it appear to be protruding. The plaintiff also complained of a sharp and constant pain in her ears, her lower lip, and her chin, while her upper palate felt thick, heavy, and numb, interfering with her ability to chew food.

On June 26, 2007, the plaintiff consulted with Gary Feldman, D.D.S., M.D., in Seattle, who noted her complaints, but explained that dental suspension procedures were unpredictable. Dr. Feldman also noted that he felt some of the plaintiff's concerns would be best addressed by a psychologist. On August 29, 2007, the plaintiff underwent electromyography (EMG) testing that had been ordered by dermatologist Anne Likosky of Kirkland, Washington. The EMG indicated that bilateral facial nerve motor conduction studies were normal, and that the risorius, orbicularis oculi, and mentalis muscles were normal bilaterally, thus suggesting no evidence of neuropathy at that time.

After undertaking an internet search, the plaintiff identified, located, and contacted Rose, who responded to her online inquiry with an email dated March 5, 2008, in which he suggested that she travel to New York for a consultation with him, and directed her to speak with his patient care coordinator to set up an appointment. Prior to meeting with Rose, the plaintiff, at Rose's suggestion, underwent a speech and voice evaluation on April 2, 2008 by speech-language pathologist Linda Carroll, Ph.D., in New York. Dr. Carroll characterized the plaintiff's chief complaint as a reduced sensation of her oral cavity affecting the swallowing function, and as an improper functioning of the lip. Dr. Carroll's evaluation revealed a moderate to severe

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
  **Motion No.  012**

**Page 4 of 25**

4 of 25

labial deficit due to an inability to achieve normal levels of labial seal for speech production and mastication. Dr. Carroll referred the plaintiff back to Rose for the consideration of surgery.

Rose first saw the plaintiff on April 3, 2008. At the appointment, Rose asked the plaintiff to articulate her complaints, after which Rose took photos and performed a facial physical examination, including puffing of the cheeks to assess tone, and directing the plaintiff to go through an array of facial movements such as smiling, lip puckering, lip pursing, eyebrow raising, eye movements, and facial grimacing. Rose outlined his plans for treatment and, according to the Aesthetic defendants, he discussed the risks, benefits, and treatment options with the plaintiff a length, and informed the plaintiff about potential complications. As the Aesthetic defendants characterized it, Rose advised the plaintiff that there were no guarantees regarding "subjective assessment of functional improvement," and that the surgical goals were functional in nature, as they were aimed "toward improving fluid retention, speech patterns, chewing and lip symmetry."

On April 4, 2008, the plaintiff saw the defendant dentist Alex M. Greenberg, D.D.S., in New York, to whom she explained that she was dissatisfied with her lower lip posture, lip incompetence, and numbness. On August 25, 2008, the plaintiff wrote Greenberg, again expressing that she was unhappy with her appearance, and noting that she had suffered from lip incompetence prior to her first surgery, but now experienced even more lip incompetence, as well as dental misalignment and a burning sensation in her lower lip area, for which she was taking Lyrica. The plaintiff further expressed concern about TMJ joint dysfunction.

Rose next saw the plaintiff on September 4, 2008, after which he noted that he had discussed the matter with Greenberg and that Greenberg had recommended a chin implant. As described by the Aesthetic defendants, Rose further discussed his proposed surgery with the plaintiff, indicating that he would perform bilateral fascia lata slings and bilateral facial advancement for correction of lip incompetence, while Greenberg would handle all aspects of the chin implant. The plaintiff returned to the Seattle area.

**800030/2011 HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No. 012**

**Page 5 of 25**

5 of 25

Greenberg wrote to the plaintiff on November 3, 2008 regarding the plan for a November 17, 2008 surgery, noting that the purpose of his aspect of the procedure would be to place a custom chin implant to lengthen the chin and restore the height that had been removed during the earlier jaw surgery, and that Rose was to perform the fascia lata sling procedure to further resuspend the lower lip, perform re-suspension of the midface, and undertake eyelid surgery. That same day, the plaintiff underwent a pre-operative consultation with her primary care physician, Elizabeth R. McCarthy, M.D., in Seattle. Dr. McCarthy noted that the plaintiff was flying to New York to have elective surgery to place a sling in her lower lip to repair some damage incurred in the prior jaw surgery, to readjust the fat pads in her face, and to undergo a brow lift. As Dr. McCarthy memorialized it, the plaintiff's medical history was significant for prior jaw surgery with facial neuropathy, for which she took Lyrica for nerve pain five times per day. Dr. McCarthy increased the plaintiff's Lyrica dose at that appointment.

The plaintiff next saw Rose for a pre-operative visit in New York on November 12, 2008. According to the Aesthetic defendants, Rose reiterated the nature of the reconstructive procedure that he planned to perform, along with the cosmetic procedures of the upper and lower bleph, with cathoplasty, brow lift, and upper lip advancement to address the thinness of the plaintiff's lips.

On November 17, 2008, the plaintiff underwent surgery performed by Rose and Greenberg at Mount Sinai Hospital in Manhattan. She signed a consent form on that date, indicating she had consulted with Rose on prior visits and had discussed the surgical procedure. The form also recited that Rose had reviewed the surgery in detail with the plaintiff, including the potential outcomes, risks, and complications. Rose performed a fasciocutaenous advancement flap right face/superficial musculoaponeurotic system (SMAS) plication facelift to suspend laxity/static re-balancing and deep structural support, a fasciocutaneous advancement flap left face/SMAS plication facelift to suspend laxity/static rebalancing for structural support, a fascia lata sling right lateral lip commissure for internal structural support, suspension of lower lip

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**                    **Page 6 of 25**
**Motion No.  012**

[* 6]

structures, and correction of lower lip incompetence, as well as fascia lata sling left lateral lip commissure for correction of lower lip incompetence and structural support, and a tissue re-arrangement of the lower lip for correction of lower lip incompetence and the re-establishment of sphincter mechanism. According to the operative report, the plaintiff's left thigh was employed as the tissue donor site. As set forth in that report, during the surgery, the plaintiff's buccal flap was elevated at the level of the SMAS, and extended through the mid-buccal cheek. The neck flap was elevated, superficial to the platysma, and was extended behind the ear overlying the mastoid fascia, after which that area was irrigated and hemostatis was obtained. Rose made an inverted L shape incision in the SMAS. A combination of fat and SMAS tissue then was employed to tighten the deeper structural support. Thereafter, a cut was made at the left lateral commissure, the orbicularis oris muscle was teased apart from the dermis, and a tunnel was created interconnecting the left lateral commissure to the facial flap. A fascia lata sling measuring 17 centimeters (cm) by 2 cm was harvested from the left lateral thigh, after which the sling was transposed to the deficit on the left side of the face. Sutures and a drain were placed, and an identical procedure thereafter was carried out on the right side. Rose's operative report recited that, prior to the surgery, the plaintiff was informed of the potential for scar hypertrophy, facial asymmetry, nerve and muscle weakness, and the need for further revision surgery.

Rose also authored a second operative report referable to the cosmetic aspects of the surgery, including the bilateral mini brow lift, upper lid blepharoplasty, lower lid blepharoplasty with canthopexy, and bilateral upper lip advancement. The report stated that, during this procedure, bilateral crescent shaped incisions were made behind the frontal hairline bilaterally and that, by employing blunt maneuvers, the fibrous adhesions at the supraorbital rim were stripped away. The supraorbital and supratrochlear nerves were identified, the temporal crest was released under direct vision, the right hemiforehead/fontalis was advanced in a superior vector, and a composite wedge of frontal scalp was excised. The flap thereafter was inset and the skin was closed. A left hemifrontal incision then was made 1 cm behind the hairline, the left

**800030/2011 HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.** Page 7 of 25
**Motion No. 012**

7 of 25

hemiforehead frontal flap was dissected in the subgaleal plane, the fibrous bands were released, the temporal crest was released under direct vision, the left hemiforehead was elevated in a vertical vector, and the composite frontal scalp skin was resected as an ellipse. Upper lid incisions were made 11 mm superior to the ciliary margin, and a thin strip of skin and orbicularis muscle was resected, while the lower lid incisions were made bilaterally along the ciliary margins and extended 1 cm lateral to the canthus. Skin muscle flap then was elevated and retracted, stab incisions were made through the septum orbital in the medial, central, and lateral compartments, fat was expressed cross-clamped and amputated at the base, and an incision was made at the base of the columella extending beneath the nostril sill around each of the respective nostrils. This completed Rose's portion of the procedure.

Immediately thereafter, Greenberg performed his portion of the procedure on the plaintiff's chin. Greenberg's post-operative report recited that both the pre- and post-operative diagnoses were anterior mandibular deformity and lower lip ptosis. It further stated that Greenberg implanted a custom silicone implant into the anterior mandible. According to Greenberg's report, the plaintiff tolerated surgery well and was brought to the recovery room with no post-operative complications, and hospital records indicated that she was discharged uneventfully.

The plaintiff next saw Rose on November 21, 2008, for her first post-operative visit. Rose reported good facial alignment and good lip alignment, and asserted that the sutures were clean and dry. He formulated a plan, pursuant to which the plaintiff was to return to Seattle, and he would provide her with post-operative instructions. Upon her return to Seattle, the plaintiff saw cosmetic and facial plastic and reconstructive surgeon Donald G. Wortham, M.D., in Lynwood, Washington, for suture removal and follow-up appointments. The plaintiff returned to New York shortly thereafter, and, on December 8, 2008, Rose examined the plaintiff, noting slight swelling and scarring in the healing of the upper lip. He purportedly encouraged the plaintiff to massage and stretch her lip. Rose also memorialized the presence of little pockets of

**800030/2011  HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

Page 8 of 25

8 of 25

[* 8]

excess vermillion (the red portion of the lips), which he trimmed under local anesthesia. The plaintiff again returned to New York and saw Rose on January 8, 2009, at which time Rose reported that the plaintiff was satisfied with the lower lip suspension, but that she complained of shortness of the upper lip that affected her speech, although she purportedly asserted that it was better than prior to Rose's procedure. As described by the Aesthetic defendants, Rose discussed options for additional procedures with the plaintiff, but informed her that there was no guarantee that she would have subjective improvement. The plan that Rose formulated was for the plaintiff to see Dr. Carroll again and then return to see him. On January 15, 2009, the plaintiff called Rose with multiple complaints, including deterioration of her speech, along with complaints about the incisions on her eyelids, brows, and nose, fullness on her right face, decreased left brow mobility, and chin projection. Rose allegedly encouraged the plaintiff again to see Dr. Carroll.

On February 10, 2009, the plaintiff returned to see Dr. Carroll, chiefly complaining of lack of labial closure, continued speech distortion, and facial distortion. Dr. Carroll reported that, while there was still some residual weakness in articulation, the articulation was much improved, as was speech clarity, while the plaintiff's maximum labial seal was now adequate to support speech. Dr. Carroll further reported that she counseled the plaintiff with respect to her residual deficits and the importance of therapy during the postoperative period.

The plaintiff saw Rose for the last time on February 11, 2009, at which consultation she purportedly explained that she had undergone an extensive evaluation by Dr. Carroll, and that Dr. Carroll had expressed that an improvement would be achieved through stretching and range-of-motion exercises. Rose did not recommend further surgery at that point, reporting that Dr. Carroll had referred the plaintiff to a therapist in Seattle for massage and stretching exercises. Since that time, the plaintiff has consulted with numerous health-care providers with respect to her discontentment with her appearance, but has elected to forego any further surgical intervention from 2009 to the present.

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**                    **Page 9 of 25**
  **Motion No.  012**

9 of 25

III.     THE PLAINTIFF'S CONTENTIONS

In her complaint, the plaintiff asserted that the defendants committed malpractice by failing to render proper plastic and oral surgical care and failed properly to perform the chin implant.  She further asserted that they excised excessive tissue during those procedures, and failed to utilize proper material for the chin implant procedure, inasmuch as the material was too soft.  The plaintiff also averred that the Aesthetic defendants performed surgery that left her with a more severe deformity of her face, eyes, mouth, and teeth than her initial pre-existing condition, and took insufficient measures to preserve the bone structure of her face, eyes, mouth, chin, teeth, and gums.  In addition, the plaintiff alleged that the Aesthetic defendants performed an inadequate examination, took insufficient x-rays, failed to take a full and proper medical and dental history, and maintained inadequate records and dental charting.  Moreover, the plaintiff alleged that the Aesthetic defendants failed to inform her of the reasonable risks and benefits of, and alternatives to, the treatment and procedure that they proposed and undertook.

The plaintiff reiterated these allegations in her bill of particulars and amended bill of particulars as to the Aesthetic defendants.  She also asserted that the Aesthetic defendants failed properly to correct ectropion on the left and right sides of her face and negligently shortened her upper lip.  The plaintiff further alleged that the Aesthetic defendants deviated from proper surgical technique by making an improper incision in the upper lip, failing to make a proper incision inside the nose, and failing to make a "buffalo horn" incision, thus causing a lower-lip droop and an excessive gap between the upper and lower lips.  Additionally, she averred that the Aesthetic defendants departed from good and accepted practice by employing fascial slings and by using fascial strips to treat mentalis ptosis, as well as by failing to elevate the mentalis muscle, failing to release the entire lower chin and submental area, and failing to bring the lip to a normal level.  The plaintiff also alleged that the Aesthetic defendants damaged the mentalis muscle after reattachment, and departed from good practice by bunching skin

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**                    **Page 10 of 25**
**Motion No.  012**

10 of 25

below and behind her ear, failing to distribute skin below and behind her ear, and using excessive traction during the facelift.

In her amended bill of particulars, the plaintiff asserted that the Aesthetic defendants were negligent in failing to recommend a more conservative treatment plan, and in failing to undertake a proper differential diagnosis. In this regard, she faulted the Aesthetic defendants for failing to inform her that fascia lata sling surgery was inappropriate for treating lip ptosis in the absence of paralysis, and that the procedure was experimental and lacked support in the medical literature, while also failing to consider that the August 29, 2007 EMG study revealed normal muscle function and no permanent nerve damage. She asserted that the Aesthetic defendants did not obtain her fully informed consent to the procedure because they failed to inform her that tissue would be removed from under her nose, and that any incision would be hidden inside the plaintiff s nose, leaving scars would be hidden and unnoticeable. The plaintiff also alleged that the Aesthetic defendants failed to inform her that the central part her lower lip might be elevated by a fascia lata sling surgery, and then failing to raise her upper lip, instead overcorrecting her mentalis muscle with fascia lata sling surgery and improperly resuspending buccal fat.

Furthermore, the plaintiff alleged that the Aesthetic defendants misdiagnosed her as having "long-face syndrome," and then failed to correct a severe amount of lower incisor "show." She asserted that they improperly performed surgery on her eyelids, and improperly shortened her upper lip because they failed to know "cosmetically and surgically" how to do so. The plaintiff also averred that the Aesthetic defendants failed properly to to properly resuspend the mentalis muscle because they failed to follow the Zide-McCarthy standards and techniques for resuspending that muscle, as described below. She asserted that the Aesthetic defendants should not have performed all procedures at one time, but should have done so sequentially on different dates, that they failed to understand that fascia lata sling surgery would impair any resuspension of the mentalis muscle, and that committed negligence by failing to release the

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

**Page 11 of 25**

[* 11]

11 of 25

entire lower chin and submental area, after negligently failing to measure the distance between her teeth and her eye sockets. The plaintiff asserted that she underwent unnecessary fascia lata sling surgery, eyelid surgery, and brow surgery, and that the attempt at resuspension of the mentalis muscle failed.

The plaintiff alleged that, as a consequence of the departures from good and accepted medical practice that she identified, and the failure to inform her of the risks of the procedure, she sustained a depression of the lower mandibular border, elevation of the mentalis muscle, lower-lip droop, an excessive gap between the upper and lower lips, right-side ectropion, left-side ectropion, scleral showing of the lower eyelids due to ectropion, and an inability to elevate her central lip. She further alleged that she was left with a scar on her upper lip under her nose, the inability to purse her lips, an asymmetric smile, bilateral facial scarring from the facelift, scarring from the brow lift, bilateral forehead scars below the hairline, scarring well below the hairline in the postauricular area, and scarring from the fascia lata sling surgery. She complained of dryness in and discomfort to her eyes, sustained retraction of the tragus of her ears due to excessive traction during her facelift, and the bunching of her skin below and behind her ear. In addition, the plaintiff claimed that, subsequent to the subject procedure, she required correction of ectropion on the right lower eyelid and resuspension of the left lateral eye lid.

Inasmuch as the plaintiff contended that the fascia lata sling surgery was unnecessary, she asserted that she suffered from the fact that fascia lata strips had been "harvested" from her left leg, and alleged that the alleged departures also caused scarring not only from the fascia lata sling, but a depressed scar on her left leg.

The plaintiff further asserted that she suffered from a loss of self-esteem, dissatisfaction with her appearance, and emotional distress arising from those injuries.

## IV. THE SUMMARY JUDGMENT MOTION

In support of their motion, the Aesthetic defendants submitted the pleadings, the plaintiff's bills of particulars, the parties' deposition transcripts, relevant hospital and medical

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**                    **Page 12 of 25**
**Motion No.  012**

records, an attorney's affirmation, and the expert affirmation of board-certified otolaryngologist and facial plastic and reconstructive surgeon, Patrick J. Byrne, M.D.

Dr. Byrne opined that the Aesthetic defendants did not depart from good and accepted medical practice, and that nothing that they did or did not do caused or contributed to any compensable injury to the plaintiff. As Dr. Byrne summarized it, the plaintiff's ongoing complaints both pre-dated the care at issue and were subjective, inasmuch as they related to her discontent with her appearance, for which no guarantees were made, and that the procedure that Rose performed "objectively improved the plaintiff's function, even if not to the level that the plaintiff had hoped for."

As Dr. Byrne described it, the plaintiff's lip incompetence was the main functional issue confronting Rose. He asserted that a fascia lata sling procedure is considered "a standard of care," and is very commonly performed in treating facial paralysis and weakness. He explained that the fascia lata sling allows for facial suspension, support, and symmetry. He concluded that the fascia lata sling was an appropriate and proper procedure to alleviate the plaintiff's complaints, including lip ptosis, and that she was appropriately presented with the option of doing nothing or opting for the fascia lata sling. Dr. Byrne rejected the plaintiff's contention that Rose should have employed the "Zide-McCarthy method," developed by Drs. Barry M. Zide and Joseph McCarthy, to address the plaintiff's lip incompetence. He stated that he was unaware of the Zide-McCarthy method or its relation to addressing lip incompetence. He further rejected the plaintiff's contention that employment of the facia lata sling was contraindicated in the absence of nerve damage, explaining that, "[w]hen a patient has the severity of lip ptosis that this patient had, a fascia lata sling is a very reasonable technique to lift the muscles and restore a more functional state. Here, the issue was muscle laxity, not nerve damage."

Dr. Byrne further concluded that Rose did not cause any nerve damage. He explained that, although the plaintiff had documented complaints prior to seeing Rose that were thought to be consistent with potential nerve involvement, including a burning sensation and paresthesia,

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**   **Page 13 of 25**
**Motion No.  012**

13 of 25

[* 13]

and that Rose should have taken the results of her prior EMG studies into consideration, an EMG does not test sensory nerves, but only motor complaints. He further opined that none of the incisions made by Rose was in an area that would have had an impact upon the facial motor nerves, nor were they deep enough to cause a transection of a major sensory nerve. Hence, Dr. Byrne asserted that any complaints of a burning sensation or paresthesia were sensory nerve issues that pre-dated the surgery that Rose performed, and would not have been evident on the EMG that had been performed. He further concluded nothing that Dr. Rose did or did not do would be expected to contribute to the plaintiff's pre-existing sensory nerve complaints, and that his surgical treatment was not for that purpose.

Dr. Bryne found "no evidence that the plaintiff's lip incompetence was due a motor nerve injury," but likely was "due to Dr. Trimble's surgery, during which he stripped the jaw of soft tissue and sutured it back." As he explained it, that procedure would result "in tissue edema and scar tissue formation, and muscle laxity.

> "This, combined with gravity and poor healing can result in facial drooping or sagging and can cause or exacerbate issues with articulation, mastication or holding fluid boluses in the mouth because the lips and facial muscles do not provide an adequate seal. These are known potential complications of jaw procedures such as the one she apparently had prior to any care and treatment with Dr. Rose. These problems would not necessarily be evident on an EMG. An EMG can be negative and the plaintiff to still have issues with incompetence or weakness (loss of ability to control a portion of the body- here, areas around the mouth)."

Dr. Byrne asserted that the procedures that Rose performed were intended to help reposition and tighten the ptotic and weak lower lip, thus aiding functional issues such as articulation, mastication, fluid bolus retention, and the ability to properly make an array of facial expressions. According to Dr. Byrne, a secondary benefit would be a more pleasing aesthetic appearance, which he asserted was not always achieved to the extent that a patient might wish for.

Referring to Dr. Carroll's post-operative assessment, Dr. Byrne stated that the plaintiff demonstrated improved function of her mouth, improved speech, and an improved lip seal, as well as a more symmetrical pattern of facial movement, which, according to Dr. Byrne,

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

Page 14 of 25

14 of 25

constituted further evidence that Rose did not cause or exacerbate any alleged nerve injury during his surgery and that, in fact, that the surgery was successful from a functional perspective.

Dr. Byrne expressly opined that the standard of care does not require a plastic surgeon to perform radiology studies, but only an evaluation consisting of having the plaintiff purse her lips, puff up her cheeks, smile, and make other facial appearances, which Rose apparently performed. He explained that Dr. Trimble performed radiological studies because he is an orthodontist, and performed wholly different procedures than that performed by Rose, which required that Dr. Trimble look at different anatomical structures, including bone, while Rose did not operate on bone during his surgery.

With respect to the plaintiff's desire to shorten her lip, Dr. Byrne asserted that she merely was dissatisfied with the result, even though Rose attempted to obtain a satisfactory result by further trimming her vermillion, and that dissatisfaction with a cosmetic result does not constitute malpractice. He rejected the plaintiff's contention that Rose should have employed buffalo horn incisions to address the plaintiff's lips, inasmuch as such incisions are not the standard of care, and concluded that there was no deviation from appropriate care in connection with the type of incisions that were utilized. Similarly, Dr. Byrne rejected the plaintiff's contention that the other incisions that were utilized departed from good and accepted practice, or that any such departure resulted the presence of excess skin below and behind the ears or residual scarring. Rather, he concluded that Rose made appropriate incisions for the types of surgical work done, and that none of them deviated from the standard of care. He explained that, where the plaintiff did have scarring "is consistent with where incisions were needed to be made for the surgery." Dr. Byrne averred that "[s]urgery cannot be performed without making incisions that then need to be closed" and that "surgeons do not guarantee results, most certainly when it comes to scarring." He stated that the plaintiff, a registered hospital nurse, was very well aware of the risks of scarring when she consented to have surgery with Rose and Greenberg, and that the

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

**Page 15 of 25**

[* 15]

15 of 25

plaintiff's objective or subjective complaints following Rose's surgery were "not the byproduct of any deviation from standard of care."

Upon reviewing the surgical and hospital records, Dr. Byrne concluded that there were no deviations from standards of care in connection with the pre-operative, peri-operative, or post-operative care that the defendants rendered to the plaintiff. As he characterized it, the plaintiff's complaints are

> "essentially aesthetic and cosmetic in nature and continue to be with various providers she has seen in the subsequent 14 years since the care at issue. In that time, the plaintiff has not sought to mitigate any of these aesthetic issues, nor her alleged functional ones."

Dr. Byrne opined that the plaintiff's current complaints are not related to the functionality of her facial features, there was no objective evidence that the plaintiff has any functional issues that have worsened because of Rose's surgery, and the plaintiff's continued dissatisfaction with her appearance "is not indicative of malpractice."

Dr. Byrne further asserted that Rose appropriately obtained the plaintiff's fully informed consent to the surgery, as the relevant records documented that Rose discussed the risks of surgery were discussed with the plaintiff, including the risk of administering anesthesia, and the risks of infection and the extent and duration of wound healing. Dr. Byrne referred to Rose's deposition testimony, in which he testified that he specifically informed the plaintiff as to the limitations and expectations of her specific fascia lata sling surgery in terms of mitigation of the lip incompetence and facial weakness, and outlined that the fascia lata slings would provide the internal support for the lower-lip flaccidity. Dr. Byrne further cited Rose's testimony that he had made no promises whatsoever that the plaintiff would be able completely to purse her lips or improve her speech patterns, her chewing, her ability to manage fluid, and her dribbling, or functional issues related to the lip weakness, as well as his testimony that he had advised the plaintiff prior to surgery that, by installing the slings, the shape of the plaintiff's lips would be altered, and that such an alteration was the trade-off in addressing the functional issues, "which

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

**Page 16 of 25**

16 of 25

was essentially the crux of her reconstructive surgery." Dr. Byrne also stated that the alteration of the shape of the plaintiff's lips was a known potential complication, and that it was appropriately and adequately addressed with the plaintiff prior to surgery. Dr. Byrne further noted that the plaintiff signed two consent forms, one at Rose's office and one at the hospital and that, as a nurse, she was "certainly familiar with the consent procedure."

Finally, Dr. Byrne noted that the plaintiff chose to not return to Rose, or communicate with him, after only "a couple" of post-operative visits, thereby foreclosing the possibility that Rose could assist the plaintiff in addressing some of her aesthetic concerns.

In opposition to the motion, the plaintiff relied upon the same documentation that the Aesthetic defendants had submitted, and also submitted a counter statement of material facts, an attorney's affirmation, a memorandum of law, numerous photographs and medical records, and photographs depicting the employment of a bullhorn incision around a patient's lips and nose. She also submitted the affidavit of a board-certified facial plastic surgeon, otolaryngologist, head and neck surgeon, and cosmetic surgeon, who personally examined her on May 11, 2023. The plaintiff's expert concluded that the Aesthetic defendants did, in fact, depart from good and accepted medical practice, and that those departures caused or contributed to the plaintiff's injuries.

The expert first noted that Rose had summarized the lower lip incompetence findings as a sudden onset motor nerve injury that had been sustained during the plaintiff's Seattle orthognathic surgery, and that Rose's diagnoses were that the plaintiff suffered from partial facial atonicity and from a paralytic lip ectropion that were "causes of her lower lip descent." According to the plaintiff's expert, these diagnoses were incorrect because the plaintiff actually suffered from a sensory nerve deficit rather than a motor nerve deficit, and had a normal EMG study performed on August 29, 2007. Moreover, the plaintiff's expert pointed out that Rose, at his deposition, asserted that he had no photographs of the plaintiff in his possession that depicted facial paralysis. The plaintiff's expert thus concluded that Rose intentionally misstated

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

Page 17 of 25

these diagnoses to justify the use of fascia lata sling surgery, and its expected reimbursement by the plaintiff and her insurer. The expert explained that, although the plaintiff may have had temporary and transient facial muscle weakness following orthognathic surgery in Seattle, "there was no evidence in light of the normal EMG that she still had muscle weakness prior to" Rose's surgery, and that there thus was no basis for Rose's suggestion that her facial muscles were "damaged by stretching during her original orthognathic procedure."

As the plaintiff's expert further asserted, fascia lata sling surgery is routinely used to support the lateral corner of the lip in patients who suffer facial nerve paralysis, in patients who have suffered severe burns, and to "counteract chronic cicatricial scarring," but it is not employed, and is not the standard of care, in connection with attempts to correct alleged facial muscle weakness in patients such as those who present with the plaintiff's clinical condition. Hence, the expert concluded that Rose not only misdiagnosed the plaintiff, and failed to rely upon or perform adequate nerve testing, but performed a contraindicated procedure. The expert noted that, even in Rose's own book on the subject, he does not state that fascia lata sling surgery should be employed to address facial nerve paralysis.

The expert further opined that, even if fascia lata sling surgery had been appropriate, Rose departed from the standard of care by poorly executing that procedure. According to the plaintiff's expert, Rose harvested the fascia lata from the left thigh, causing an unnecessary scar and depression deformity, then split the distal end of the fascia lata into four strips, inserting one strip into the upper lip near the tubercle, one into the modiolus (corner of the mouth), one into the lower lip along the vermillion, and the last one into the mento-labial crease, thus causing the plaintiff to have additional cosmetic deformities in the lip and cheeks, including excessive puckering and creasing of the left lip vermillion border, and diagonal abnormal depressions, especially in the left cheek.

In addition, the plaintiff's expert asserted that Rose departed from the standard of care when he placed the incision 1.5 cm behind the hairline during the surgery, instead of placing the

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**                        **Page 18 of 25**
**Motion No.  012**

[* 18]

incision at the hairline or immediately in front of the hairline, thus excising hair-bearing scalp and leaving an unsightly incision, as documented in photographs taken seven days after the surgery, which the expert asserted remains visible 15 years later. The expert further faulted Rose for failing to address the plaintiff's blepharoptosis, despite noting it in his pre-operative report, and for incorrectly diagnosing the plaintiff with bilateral blepharochalasia, which the expert described as a rare inflammatory condition that causes intermittent swelling of the eyelids, rather than dermatochalasis, which the expert asserted was present in the plaintiff's right upper eyelid and was present minimally in her left eyelid. The expert further asserted that Rose departed from the standard of care by suggesting that the plaintiff's primary care physician, an internist, remove the interrupted 6-0 silk sutures, since her primary care physician lacked the expertise, instruments, and time to remove such fine sutures.

In addition, the plaintiff's expert asserted that Rose departed from the standard of care by performing unnecessary lower eyelid surgery, inasmuch as the plaintiff did not have excess lower eyelid skin or fatty tissue. The expert averred that, rather, she presented hollowness at the orbital rim (tear trough) and had a definite tendency to right scleral show, and that Rose's external, subciliary, and invasive approach was a poor choice because it was more likely to be unsuccessful. Specifically, the plaintiff's expert explained that Rose

> "developed a skin/muscle flap and removed fat from the central, medial, and lateral pocket while entering through the orbital septum. He then 'conservatively' trimmed the skin muscle flap . . . . His lateral canthoplasty was not adequate to offset the downward pull created by unnecessary tissue removal and internal scarring of the lower eyelid. This surgery pulled down the lower eyelid margin causing increased scleral show, which was a departure from the standard of care. (This procedure is often and less accurately called a lower eyelid ectropion.) The adverse sequalae of the lower lid procedure including excessive tearing and eye dryness were documented by Dr. Wortham as well as by an oculoplastic surgeon, Dr. Bryan Sires with post-operative photos taken on January 27, 2009 . . . and by Dr. Wortham's photographs taken on January 21, 2009"

The expert continued that the plaintiff's pre-operative photographs

> "document that she had a mildly long upper lip; notwithstanding, Dr. Rose departed from the standard of care by performing a lip lift procedure that was not

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No. 012**

**Page 19 of 25**

[* 19]

19 of 25

indicated given its tendency to increase her pre-existing lip closure incompetence. The standard of care called for Dr. Rose to properly construct a 'bull horn incision,' which best hides the scar . . . Dr. Rose made an incision from the nasal ala into the upper aspect of the nasolabial fold . . . which is more noticeable and causes a long-term detectable scar. More problematic is the short upper lip caused by Dr. Rose's lip lift procedure . . . Furthermore, by his departure from the standard of care, Dr. Rose undermined the upper one-third of Kathleen Hutton's upper lip, and then excised the margin of the tissue on her upper lip. Dr. Rose's departure from the standard of care caused too much eversion of her vermillion border."

Although the plaintiff's expert conceded that Rose corrected some of the eversion of vermillion tissue in the immediate post-operative period, Rose, having observed excessive elevation, wanted to pre-authorize a dermal skin graft "and another insurance procedure," as he planned to perform the latter procedure in his own out-patient surgical facility, but never performed it.

The expert concluded that Rose essentially performed a SMAS short-scar face lift, but departed from the standard of care by failing to redistribute the excess skin in the post-auricular region, instead excising a "Burrow's triangle of skin" that caused an unacceptable, noticeable scar below the earlobe, extending into the upper neck. The expert further asserted that Rose departed from the standard of care by excessively and carelessly trimming the plaintiff's cheek flap, which created a forward pull that displaced the tragal ear cartilage with immoderate exposure of the ear canal opening. The plaintiff's expert opined that the proper surgery for to address deficiencies in the plaintiff's mentalis muscle was to surgically resuspend the mentalis muscle by drilling holes through the alveolar bone, and then using sutures to tighten the lower mentalis muscles, a procedure known as the Zide-McCarthy protocol.

The expert also concluded that Rose departed from the standard of care by failing to communicate with the plaintiff's primary care physician in Seattle to assure that the plaintiff received adequate follow-up care and appropriate suture removal, instead leaving the planitiff "to find a willing surgeon on her own (Dr. Wortham) to provide her with necessary care subsequent to the joint care and surgery by the defendants."

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**                                    **Page 20 of 25**
**Motion No.  012**

20 of 25

Furthermore, the plaintiff's expert opined that the consent that the Aesthetic defendants obtained from the plaintiff was qualitatively insufficient. As the expert explained it, the standard of care calls for surgeons to obtain an informed consent from a patient in a manner that will allow a patient to fully evaluate the risks and alternatives of an invasive procedure, and thus required the Aesthetic defendants to obtain a written consent form that set forth the risks of and alternatives to the treatment plans and joint surgery. The expert asserted that Rose's written consent form did not list the alternatives to the surgical treatment and did not inform the plaintiff that he would be performing a fascia lata sling surgery for a purpose outside of its usual scope.

V. SUMMARY JUDGMENT STANDARS

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr*., 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp*., 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp*., 18 NY3d at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn*., 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

Page 21 of 25

[* 21]

issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr.*, 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

Moreover, where a party's submission itself reveals the existence of a triable issue of fact, that party has failed to establish its prima facie entitlement to judgment as a matter of law (*see Reading v Fabiano,* 137 AD3d 1686, 1687 [4th Dept 2016]; *Kimber Mfg., Inc. v Hanzus*, 56 AD3d 615, 617 [2d Dept 2008]).

### A. MEDICAL MALPRACTICE BASED ON ALLEGED DEPARTURES FROM GOOD AND ACCEPTED PRACTICE OR STANDARDS OF CARE

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr*., 70 AD3d 15, 24 [1st Dept 2009]; *see Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp*., 10 AD3d 521, 522 [1st Dept 2004]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp*., 68 NY2d 320, 324 [1986]; *Frye v Montefiore Med. Ctr*., 70 AD3d at 24) or establish that the plaintiff was not injured by such treatment (*see McGuigan v Centereach Mgt. Group, Inc*., 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]). To satisfy the burden, a

800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.                    Page 22 of 25
Motion No.  012

22 of 25

defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009]; *Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]). If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept 2010]). Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id*., quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]). Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars (*see Wall v Flushing Hosp. Med. Ctr*., 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]). Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325; *see Frye v Montefiore Med. Ctr.*, 70 AD3d at 24). In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to

**800030/2011 HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No. 012**

**Page 23 of 25**

preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

In connection with the medical malpractice cause of action, although the Aesthetic defendants established their prima facie entitlement to judgment as a matter of law with their submissions, including Dr. Byrne's affirmation, the plaintiff raised a triable issue of fact with her submissions, including her expert physician's affidavit and relevant photographs. Specifically, the plaintiff raised triable issues of fact as to whether the Aesthetic defendants performed a procedure contraindicated for the condition that she wish to have addressed, whether the procedure that was performed was undertaken improperly in any event, and whether she sustained disfigurement and other damages as a proximate cause thereof. Hence, that branch of the Aesthetic defendants' motion seeking summary judgment dismissing the medical malpractice cause of action insofar as asserted against them must be denied.

### B. LACK OF INFORMED CONSENT

To establish a lack of informed consent cause of action, the plaintiff must adduce evidence showing that (1) the Aesthetic defendants failed to disclose information as to the risks and benefits of, and alternatives to, the procedure that would and should have been disclosed by a reasonable medical practitioner, (2) a reasonably prudent person in the plaintiff's position would not have undergone the treatment had that person been fully informed, and (3) the lack of informed consent was a proximate cause of the planitiff's injury (*see King v Jordan*, 265 AD2d 619, 620 [3d Dept 1999]; Public Health Law § 2805-d[1]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]).

Although the Aesthetic defendants made a prima facie showing of entitlement to judgment as a matter of law in connection with the lack of informed consent cause of action, the plaintiff, through her expert's affidavit, raised a triable issue of fact as to whether the consent

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**

**Page 24 of 25**

that they obtained from her was fully informed and qualitatively sufficient (*see Gray v Williams,* 108 AD3d 1085, 1085 [4th Dept 2013]; *see also Sarwan v Portnoy*, 51 AD3d 655, 656 [2d Dept 2008]). Specifically, she raised a triable issue of fact as to whether, under the circumstances obtaining here, the written consent form did not fully apprise her of the fact that the proposed surgery was one of two or more options for treating her condition, and that it was not the preferred option for treating lip incompetence and muscle weakness. Consequently, the court must deny that branch of the Aesthetic defendants' motion seeking summary judgment dismissing the lack of informed consent cause of action insofar as asserted against them.

### C. VICARIOUS LIABILITY

Where a physician or health-care professional working for a professional corporation renders medical care to a patient "within the scope of his or her employment" for that corporation, the corporation may be held vicariously liable for the negligence of the physician (*Petruzzi v Purow*, 180 AD3d 1083, 1084-1085 [2d Dept 2020]). Inasmuch as this court has concluded that there are triable issues of fact as to whether Rose committed malpractice, it also concludes that the professional corporation, as his employer, may be held vicariously liable for that malpractice.

### VI. CONCLUSION

In light of the foregoing, it is,

ORDERED that the motion is denied.

This constitutes the Decision and Order of the court.

| 2/13/2024 | | JOHN J. KELLEY, J.S.C. |
|-----------|--|------------------------|
| **DATE**  | | |

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
|------------|--|---------------|--|---|------------------------|--|
| | | GRANTED | X DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

**800030/2011   HUTTON, KATHLEEN vs. AESTHETIC SURGERY P.C.**
**Motion No.  012**